UNITED STATES of America,
Plaintiff–Appellee,

v.

Miguel SANDOVAL, Defendant–
Appellant.

No. 93–4226.

United States Court of Appeals,
Tenth Circuit.

July 7, 1994.

Loni F. DeLand, McRae & DeLand, Salt Lake City, UT (D. Gilbert Athay with him on the brief), for defendant-appellant.

Scott M. Matheson, Jr., U.S. Atty., and Bruce C. Lubeck, Asst. U.S. Atty., Salt Lake City, UT, for plaintiff-appellee.

Before TACHA, Circuit Judge and McKAY, Senior Circuit Judge and SHADUR, Senior District Judge.*

SHADUR, Senior District Judge.

Miguel Sandoval ("Sandoval") was indicted for possessing with the intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Sandoval filed a motion to suppress the evidence of the cocaine itself on the ground that it had been obtained in violation of his Fourth Amendment rights. After an evidentiary hearing the district court denied that motion (829 F.Supp. 355 (D. Utah 1993), cited "Opinion at ——").[1] Sandoval then entered a guilty plea conditioned on his right to appeal the suppression ruling pursuant to Fed.R.Crim.P. 11(a)(2). We reverse and remand for further proceedings.

*Facts*

Shortly before 8 a.m. on Monday, March 22, 1993 Utah Highway Patrol Trooper Jim

Hillin ("Hillin") was traveling westbound on Interstate 70 in Sevier County, Utah. Hillin observed an eastbound pickup truck that he clocked at 71 to 73 miles per hour, somewhat over the 65-mile-per-hour speed limit on the interstate highway. Hillin turned his car onto the westbound lanes, caught up with the pickup truck, activated his emergency lights and pulled the truck over.

Hillin approached the truck and asked its sole occupant, Sandoval, for his driver's license and vehicle registration. Sandoval produced a California license in his name and a registration in his daughter's name. In response to Hillin's further inquiry, Sandoval said he was traveling to Denver to visit a friend.

Hillin told Sandoval that he had been speeding, returned to the patrol car, prepared a warning citation and ran an NCIC computer check on both Sandoval and the truck. That check reflected that (1) there were no outstanding warrants for Sandoval, (2) his license was valid and (3) the vehicle was not stolen, but (4) Sandoval "had been involved with some type of a hit-and-run," and he had been arrested (but not convicted) for a claimed narcotics violation back in 1988.

Hillin returned to the truck and asked Sandoval to come back to the patrol car with him. Hillin testified at the suppression hearing (Tr. 16) that he did so "[t]o inquire into" Sandoval's criminal history. With Sandoval in the passenger seat next to Hillin, the officer showed Sandoval the radar reading, cautioned him about the need to observe the speed limit (particularly when driving downhill), handed him the warning citation and returned his documents. At that point the following exchange took place:[2]

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

1. Opinion at 362 granted Sandoval's corollary motion to suppress the self-incriminating statements that he had made after his arrest but before he received a *Miranda* warning. That ruling has not been appealed by the United States, so it is not before us for review.

2. This and later quotations are taken from a videotape of the stop, made using a video camera

mounted on the dashboard of Hillin's patrol car. That tape begins as the two cars pull over to the side of the road. Because the tape is not of the kind that contains a built-in time counter that flashes on the screen when it is replayed, the times referred to in this opinion are taken from a VCR time counter, measured from the time the first videotaped image appears on the screen. In those terms the quoted exchange begins at 9 minutes 35 seconds into the tape.

Hillin: This is your license and your registration back.

Sandoval: That's it?

Hillin: No, wait a minute.

Sandoval: Oh.

Hillin immediately went on to ask Sandoval what his prior arrest was for (Sandoval initially responded that he did not recall), if he were still involved in "drugs" (Sandoval said "no") and if he were carrying any weapons on his person (Sandoval again said "no"). After Hillin said he knew the earlier arrest was drug-related, the line of questioning then culminated in the following: [3]

Hillin: You're not carrying any drugs today?

Sandoval: No.

Hillin: You're sure?

Sandoval: Sure.

Hillin: It's okay to look?

Sandoval: Sure.

Hillin: Okay. I appreciate that.

Hillin told Sandoval to remain in the patrol car and then proceeded to search the truck. On its underside the officer noticed spot welding and the hinges of an access door near the driver's side fuel tank, which appeared to be new compared to the passenger side fuel tank. Hillin called on his radio for backup, and when he asked Sandoval about the apparent modifications to the truck Sandoval responded that he was not aware of any. Then a second patrol officer arrived, looked at the access door and agreed it appeared to be to a hidden compartment.

Hillin then asked Sandoval if he could inspect the access door more closely, to which Sandoval responded "All right." [4] Using a screwdriver, Hillin opened the access door and found packages containing cocaine in a compartment behind the door. That is the evidence that Sandoval unsuccessfully moved to suppress in the district court.

### Standard of Review

We will uphold a district court's factual findings made in connection with a motion to suppress unless they are clearly erroneous (*United States v. Little,* 18 F.3d 1499, 1503 (10th Cir.1994) (en banc)). By contrast, conclusions as to whether the police action at issue "was reasonable under the Fourth Amendment is a question of law that we review de novo" (*United States v. Maestas,* 2 F.3d 1485, 1490 (10th Cir.1993)). Although "[t]he proponent of a motion to suppress bears the burden of proof" in general terms (*United States v. Moore,* 22 F.3d 241, 243 (10th Cir.1994), citing *Rakas v. Illinois,* 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 423–24 n. 1, 58 L.Ed.2d 387 (1978)), whenever the government relies on the consent of the defendant to validate a search the government bears the burden of proving that the consent "was freely and voluntarily given" (*Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *United States v. Price,* 925 F.2d 1268, 1271 (10th Cir.1991)).

### Substantive Legal Standards

■ *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968) and its numerous progeny teach that law enforcement officers may seize and search individuals based on a reasonable suspicion of criminal activity derived from "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion" (*id.* at 21, 88 S.Ct. at 1880)—something less than probable cause. *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325 counsels that the permissible scope of any such "investigative detention" depends on "the particular facts and circumstances of each case," but that in every case it "must be temporary and last no longer than is necessary to effectuate the purpose of the stop."

■ In the context of traffic stops, we frequently hark back to the succinct summary in *United States v. Guzman,* 864 F.2d 1512, 1519 (10th Cir.1988) (citations omitted), most recently quoted in *United States v. Fernandez,* 18 F.3d 874, 878 (10th Cir.1994):

An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and

---

**3.** That exchange starts at 10 minutes 54 seconds into the tape.

**4.** That exchange takes place from 29 minutes 28 seconds to 29 minutes 48 seconds into the tape.

issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

*United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994) teaches that further questioning and the concomitant detention of a driver are permissible in either of two circumstances: (1) during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity (see, e.g., *United States v. Soto,* 988 F.2d 1548, 1554 (10th Cir.1993); *United States v. Horn,* 970 F.2d 728, 732 (10th Cir.1992)) or (2) the driver voluntarily consents to the officer's additional questioning. In the first situation a Fourth Amendment seizure has taken place, but it is reasonable and consequently constitutional. In the second there is no seizure, and hence the Fourth Amendment's strictures are not implicated. But if neither of those factors is present, evidence derived from further questioning (or, a fortiori, from an ensuing search) is impermissibly tainted in Fourth Amendment terms.

On appeal Sandoval argues that his Fourth Amendment right to be free from unreasonable searches and seizures was violated because neither of the two described circumstances was present, rendering his continued detention and the later search of the truck improper. Because the district judge based his rejection of that argument on his finding that the search of the truck took place during a police-citizen encounter to which Sandoval consented voluntarily, that issue will be addressed first.

*Voluntariness of the Continued Encounter*

■ *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991) has reconfirmed the Supreme Court's adherence:

to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable

person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

That totality-of-the-circumstances approach means that "[n]o single factor dictates whether a seizure has occurred" (*United States v. Houston,* 21 F.3d 1035, 1037 (10th Cir.1994)). In the context of traffic stops this Circuit has adopted as an indicium of a seizure the officer's taking of necessary documentation (driver's license and vehicle registration) from a driver, and we have also considered as a necessary (but not always sufficient) condition of the termination of that seizure the officer's return of such documentation— both of those rulings being based on the premise that the requisite consent is impossible because no "reasonable person" would feel free to leave without such documentation (*United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993)).

After the point at which the driver has his or her other documentation back, the touchstone of our analysis is simply whether— adapting the language of *Bostick* to the circumstances of a traffic stop—the driver (*United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir.1990)):

has an objective reason to believe that he was not free to end his conversation with the law enforcement officer and proceed on his way.

Where such a belief is present based on the "objective" facts of the situation, a voluntary police-citizen encounter is said to arise (see, e.g., *McKneely,* 6 F.3d at 1451–53; *Werking,* 915 F.2d at 1409).

■ In this case the district court's Opinion at 361 explained its conclusion that Sandoval had consented to the search during such an encounter solely in terms of the factors we had set out in *United States v. Turner,* 928 F.2d 956, 959 (10th Cir.1991). *Turner, id.* stated that a "coercive show of authority" by an officer that would negate a reasonable person's belief that he or she was free to leave would include items:

such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a

commanding tone of voice indicating that compliance might be compelled.

Because the district court found none of those factors present here, Opinion at 361 held that "the objective evidence indicates that a reasonable person would have believed, in Sandoval's position, that he was free to leave after receiving back the drivers license and registration." Consequently the district court concluded that "Sandoval freely and voluntarily consented to the search of the pickup for drugs" (Opinion at 362).

That view has misapprehended *Turner.* We did not purport there to set out the sine qua non for a determination that a reasonable driver would have felt free to proceed on his or her way. We did not intend (nor could we under the Supreme Court's teaching) that the absence of those specific factors compels the conclusion that a driver consented voluntarily to a police-citizen encounter. Instead they are only examples (but not an exhaustive compendium) of criteria that may be considered under the totality-of-the-circumstances analysis that we have called for in such cases as *Price,* 925 F.2d at 1271 and *Werking,* 915 F.2d at 1409–10.

In this instance the focal point of the inquiry as to Sandoval's reasonably perceived freedom to leave (or the lack of it) is Hillin's "No, wait a minute" directive to Sandoval, spoken inside the patrol car immediately after Hillin had returned Sandoval's license and registration. On that score it is worth briefly noting one aspect of what the district court said in its opinion (Opinion at 358 n. 9):

> From evidence presented at the June 11, 1993, hearing, however, the court does not believe the statement was made to stop Sandoval from leaving the vehicle, but was rather an indication by the officer that he wanted to continue his conversation with Sandoval. As noted in this opinion, the court believes Sandoval did not have to stay to continue the conversation, but was free to go when he received back the drivers license and registration.

That footnote refers to the district court's later analysis (which as already mentioned was based on the absence of the factors referred to in *Turner* ), but it also reflects a plainly mistaken characterization of Hillin's statement to Sandoval. Importantly, what precedes the just-quoted language is this statement (*id.*):

> It is unclear from the tape whether or not Officer Hillin's statement "no, wait a minute" is in response to a movement by Sandoval to exit the vehicle.

That plainly misses the whole point—that Hillin's "No, wait a minute" was a direct response to Sandoval's "That's it?" inquiry (an inquiry that, although plainly audible on the tape, is mentioned nowhere in the Opinion). It is thus wholly beside the mark to say that it is uncertain whether Hillin was responding to a *movement* by Sandoval to leave the patrol car (something that in any event could not possibly be detected by the video camera, which was focused on the rear of the truck from behind and could not pick up any movements within the patrol car).

Moreover, as we have said, Hillin's own testimony at the June 11, 1993 hearing was that he had asked Sandoval back to the patrol car "To inquire into the criminal history" (Tr. 16). That purpose was not served by Hillin's innocuous counseling of Sandoval about the need to be careful when driving downhill, coupled with the return of Sandoval's documentation. Without any question Hillin's "No, wait a minute" was—from *his* point of view—intended to prevent Sandoval from leaving the vehicle so that Hillin could "inquire into [Sandoval's] criminal history" as he had intended to. And it was precisely that inquiry that Hillin undertook immediately after his negative response to Sandoval's "That's it?" inquiry.

Of course it is not Hillin's subjective intent, but rather the objective impact of what he said on a reasonable listener, that controls. But Hillin's own admission as to his motive does support the lack of any ambiguity in what he said. And to return to the issue of objective impact, we hold that the district court's determination is clearly erroneous. It missed entirely the context in which Hillin gave his response to Sandoval. And Hillin did not phrase that "No, wait a minute" response to Sandoval's "That's it?" inquiry as though that contemplated any possibility of noncompliance on Sandoval's part, as when

an officer inquires "May I ask you a question?" No one who is seated in a law enforcement officer's vehicle after having been stopped by the officer for a perfectly legitimate reason, and who then asks whether the stop is at an end ("That's it?") and is immediately told "No" and to "wait a minute," can reasonably view himself or herself as free to leave the patrol car.

Just a few seconds more than a minute then elapsed before Hillin asked if he could search for drugs and got Sandoval's acquiescence. During that brief period Hillin asked Sandoval a series of questions as to whether he was "still involved" in drugs [5] and whether he was carrying any weapons or drugs. At no point did the nature of those inquiries change the climate so that the reasonable listener would view participation in the exchange as freely terminable by leaving the patrol car. Hence the crucial predicate to a voluntary police-citizen encounter is missing, so that Sandoval's consent to the search of the truck cannot be justified as the consequence of such a consensual interaction.

Because no such consensual . encounter took place, by definition Sandoval was "seized" within the meaning of the Fourth Amendment once Hillin returned Sandoval's documents but did not allow him to leave the patrol car. This in turn leads us to the next issue to be addressed on review.

### Lawfulness of the Continued Detention [6]

Even in the absence of a voluntary police-citizen encounter, evidence will be admissible "if the officer had reasonable and articulable suspicion to justify a *Terry* -type detention" during which the evidence was uncovered (*Turner*, 928 F.2d at 959). In that regard the relevant question is whether, once Hillin

had run his computer checks and issued the warning citation, there was a reasonable suspicion that justified Sandoval's continued detention (a seizure in Fourth Amendment terms) and the search of the truck. *Fernandez*, 18 F.3d at 878 (citation and internal quotation marks omitted) finds such detention:

> can only be justified if specific and articulable facts and rational inferences drawn from those facts gave rise to a reasonable suspicion of criminal activity.

■ Here the only fact relied on by Hillin (and by the government in its brief) as a potential ground for suspicion is the computer-generated information about Sandoval's involvement in a hit-and-run incident [7] and his prior arrest for a narcotics violation. But as the district court correctly stated, even knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion. That is the direct thrust of our opinion in *United States v. Santillanes*, 848 F.2d 1103, 1107–08 (10th Cir.1988) and of *United States v. Oates*, 560 F.2d 45, 59–60 (2d Cir.1977) (adhering to *United States v. Fields*, 458 F.2d 1194, 1198 (3d Cir.1972))—and we have found no case elsewhere that even suggests the contrary (contrast cases that couple such knowledge of prior criminal activity with other factors that do foster a reasonable suspicion of current criminal activity, such as *United States v. Daoust*, 916 F.2d 757, 759 (1st Cir.1990); *United States v. Wheeler*, 800 F.2d 100, 103–04 (7th Cir.1986); *United States v. Gordon*, 722 F.2d 112, 114 (5th Cir.1983) (per curiam); and *United States v. Chamberlin*, 644 F.2d 1262, 1265 (9th Cir.1980)).

> We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court. We consequently review that conclusion here.

5. Note Hillin's implicit conversion of Sandoval's earlier *arrest* on a drug charge into the equivalent of a conviction on such a charge.

6. In this respect the district court expressly found that Hillin did *not* have any reasonable suspicion that would justify Sandoval's detention (Opinion at 360). Nonetheless, as we have frequently said in such cases as *Medina v. City & County of Denver*, 960 F.2d 1493, 1495 n. 1 (10th Cir.1992) (citations and internal quotation marks omitted):

7. In that respect the record is unclear as to the nature of that matter—it does not specifically speak of a criminal charge, or of a conviction on such a charge. But it obviously would make no difference if it had, for any such charge would of course be irrelevant to the issue of "reasonable suspicion" of current criminal activity.

If the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a *reasonable* suspicion, and of the need that such stops be justified in light of a balancing of the competing interests at stake (*United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)):

> We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

In short, for Hillin to use Sandoval's earlier involvement of some sort in a hit-and-run incident and his 5–year–old arrest (but no conviction) for a claimed narcotics violation as a basis to suspect Sandoval's present violation of the drug laws is just the sort of (*Fernandez*, 18 F.3d at 878, quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)):

> officer's "inchoate and unparticularized suspicion or hunch" [that] is insufficient to give rise to reasonable suspicion.

Lacking any reasonable suspicion of current criminal activity on Sandoval's part, Hillin had no reasonable justification for Sandoval's continued detention—thus rendering such detention an unconstitutional seizure. That then leads us to the final step in the analysis:

whether Sandoval's ensuing consent to the search of the truck is ineffective as the "fruit of the poisonous tree" of that Fourth Amendment violation.

### *Effect of the Later Consent* [8]

■ As to the search of the vehicle, *United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir.1989) (adapted to this case) defines the government's burden as to Sandoval's consent:

> If the consent is not sufficiently an act of free will to purge the primary taint of the illegal [seizure], it must be suppressed as fruit of the poisonous tree.

Once again the resolution of that issue depends on whether "the consent to search was voluntary in fact under the totality of the circumstances" (*Fernandez*, 18 F.3d at 881).[9] But here, where the government's earlier conduct infringed Fourth Amendment rights, it must proffer objective evidence that "establish[es] a break in the causal connection between the illegality and the evidence thereby obtained" so that the consent is sufficiently removed to be "an act of free will" (*Recalde*, 761 F.2d at 1458).

■ Just as was true in the earlier totality-of-the-circumstances inquiry, no single fact can be dispositive of that determination. This Court has consistently held that three factors are to be accorded special weight—adapting *Guzman*, 864 F.2d at 1520 (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)) to the facts of this case:

> The temporal proximity of the [seizure and consent], the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct are all relevant.

---

**8.** Our already-announced conclusions do not end the case because up to this point we have dealt with whether the totality of the encounter was voluntary, such that any consent given during the encounter would necessarily be voluntary as well. In what follows we focus (just as we did in *United States v. Recalde*, 761 F.2d 1448, 1458–59 (10th Cir.1985)) on whether Sandoval's later consent was "voluntary in fact" despite the taint of his unreasonable seizure.

**9.** In *Guzman*, 864 F.2d at 1520–21 we remanded on that issue because "the district court made no

findings on the issue of consent, which is a question of fact." But here the district court did address the factual issue of voluntary consent, so that (*Fernandez*, 18 F.3d at 881–82 n. 7 (citations and internal quotation marks omitted)):

> A remand on this issue is unnecessary because the proceedings below resulted in a record of amply sufficient detail and depth from which the determination may be made.

And on the record here the proper legal analysis is a question of law, which this Court addresses de novo (*id.* at 881–83).

We have also regularly considered, as "important factors" on the issue of voluntariness although not dispositive, whether the driver was informed of his right to refuse consent or to proceed on his way (see, e.g., *Fernandez*, 18 F.3d at 882; *Maez*, 872 F.2d at 1456; *Recalde*, 761 F.2d at 1458–59).

■ In this instance all three of the *Brown*-identified and *Guzman*-approved factors underscore the causal connection between the initial unconstitutional detention and the ensuing consent. And those factors are buttressed by the fact that Hillin never informed Sandoval of his right to refuse consent or to proceed on his way (indeed, we have already spoken of the opposite message that Hillin gave Sandoval on this latter subject).

As for the first of the *Brown–Guzman* factors, a mere 75 seconds elapsed between the illegal detention and Sandoval's consent to the search, a time period clearly insufficient by itself to break the causal link and to allow free will to flourish (see *Fernandez*, 18 F.3d at 883 and cases cited there). Unsurprisingly, there were also no intervening circumstances of significance (the second factor) in that brief time span between those two events (see *Maez*, 872 F.2d at 1455). Instead Hillin began questioning Sandoval immediately after the illegal seizure about Sandoval's involvement in and possession of drugs and weapons, a line of questioning that led directly to Hillin's request to search the truck.

In terms of the third *Brown–Guzman* factor, officer Hillin's action was clearly purposeful: He expressly admitted that he asked Sandoval to sit in the patrol car in order to question him about the reported "criminal history." Additionally, during the 75 seconds that separated the seizure and consent, Hillin is heard asking, and then having Sandoval show, what is in his pockets. All in all, the impression is unavoidable that the officer purposefully embarked on what was legally nothing more than a fishing expedition, apparently "in the hope that something might turn up" (*Fernandez*, 18 F.3d at 883, quoting *Brown*, 422 U.S. at 605, 95 S.Ct. at 2262).

It is of course irrelevant that Hillin may have regarded his own actions as somehow justified. "Reasonable suspicion" is a question of law for the court, and where it is absent law enforcement officers can only be said to be acting on an impermissible hunch.

In sum, all three of the *Brown–Guzman* factors negate any unlinking of Sandoval's consent to search from the invalid seizure that immediately preceded that consent. And as we have said a bit earlier, that conclusion is reinforced by Hillin's failure to inform Sandoval of his right to leave once the warning citation had been issued, or of his right not to consent to the search of the truck.

Nor was the taint that we have found in this opinion somehow purged by Sandoval's later consent in response to Hillin's ensuing request to open the hidden compartment. Again there were no intervening events, and the government points to none, that would call for the different conclusion that the final consent was a sufficient act of free will to be purged of the taint of his unconstitutional detention. Roughly 20 minutes elapsed between the onset of Sandoval's illegal detention and Hillin's later request—a passage of time that does not itself support a finding of voluntary consent (see *Maez*, 872 F.2d at 1447, 1455–56 (taint of illegal arrest not purged when consent form signed roughly 30 minutes after illegal arrest); *United States v. Mendoza–Salgado*, 964 F.2d 993, 1012 (10th Cir.1992) (passage of 30–45 minutes between illegal entry and defendant's consent considered alone "reveals little about whether [the time] that elapsed had any effect on her decision to permit the search")).

We have come to the end of the road (at least in the figurative sense). On the facts amply developed by the district court, the taint of Sandoval's initial seizure clearly had not been purged when he consented to the search of the truck, rendering that consent ineffective as the "fruit of the poisonous tree."

*Conclusion*

This case has not called for us to resolve disputed factual issues. Instead, applying

the relevant rules of law to the undisputed facts, we have held that:

1. Sandoval did not consent voluntarily to a police-citizen encounter with Hillin.

2. Once the warning citation had been issued, Hillin lacked any reasonable suspicion to justify his continued detention of Sandoval and the ensuing search of the truck.

3. Sandoval's later consent to the search was not purged of the taint of the unconstitutional seizure, so that his later consent was legally ineffective.

We therefore REVERSE the district court's denial of Sandoval's motion to suppress. Because Sandoval's guilty plea was a conditional plea under Fed.R.Crim.P. 11(a)(2), we REMAND for further proceedings in accord with this opinion.