**UNITED STATES of America, Plaintiff,**

v.

**Constantino MOTA and Raul Batalla, Defendants.**

**No. 94–CR–42–J.**

United States District Court, D. Wyoming.

Sept. 22, 1994.

Solomon J. Chacon, Salt Lake City, UT, for Constantino Mota, Raul Batalla.

Federal Public Defender, Federal Public Defender's Office, Cheyenne, WY, for Raul Batalla.

John R. Green, U.S. Attorneys Office, Cheyenne, WY, for U.S.

### DECISION GRANTING DEFENDANTS' MOTIONS TO SUPPRESS

ALAN B. JOHNSON, Chief Judge.

This matter is before the court on defendants' Motions to Suppress evidence obtained during a traffic stop. The court has considered the Motions filed by each defendant, the government's Joint Response, the government's Supplemental Response, the memorandum, Defendant Mota's Submission of Supplemental Authority, Defendant Batalla's Joinder, the Government's Response to Submission of Defendants' Supplemental Authority, the testimony received at the suppression hearing, has heard argument of counsel and upon its own review of the applicable statutes and authorities being fully advised, does hereby render its decision as follows.

### FINDINGS OF FACT

On March 16, 1994, at about 5:30 p.m. Russ Pollard, a Wyoming Wildlife Enforcement Coordinator was traveling westbound on Interstate 80 between Cheyenne and Laramie, Wyoming. Shortly after leaving Cheyenne, Mr. Pollard noticed a 1985 Ford Thunderbird with Utah license plates and two Hispanic male occupants. Mr. Pollard is a former Wyoming Highway Patrolman who makes it his business to spot out-of-state cars during his travels. He "runs checks" on such out-of-state vehicles about 5–8 times whenever he is out on the highways.[1] On this day, approximately one-half of the vehicles on the Interstate with Mr. Pollard had out-of-state license plates.

---

1. The Thunderbird was the only vehicle for which he ran a check on this particular day.

The Thunderbird was traveling well under the speed limit but Mr. Pollard monitored the vehicle and his suspicions were aroused by the lack of clothes on hangers or suitcases in the back seat. Mr. Pollard called the Wyoming State Law Enforcement Communication System and asked for a check to determine if the Thunderbird was stolen and also asked them to check with Utah to see if the registered owner had any prior offenses. The System informed Mr. Pollard that the vehicle was not stolen, that there were no wants or warrants, and that its registered owner, Raul Batalla, had "prior offenses" involving a concealed weapon and narcotics in the state of Utah. At that time Mr. Pollard did not know if the prior offenses involved mere arrests or actual convictions. In fact the "prior offenses" consisted of an arrest, but no conviction, for possession of cocaine and a 1988 conviction for a firearm violation for which Mr. Batalla was sentenced to probation. In his subsequent Incident Report Mr. Pollard stated that he called for more information on the Thunderbird and its owner due to his "sixth sense" based upon his admittedly "somewhat limited experience with drug offenders" and his experience in law enforcement.

When Mr. Pollard left the Interstate in Laramie, Wyoming, the Thunderbird traveled on. "Knowing that I-80 is a major route of travel for drug trafficking" and being "concerned for officer safety" Mr. Pollard radioed the Wyoming Highway Patrol dispatch and reported his findings. They then relayed the following information to patrolmen in the field:

> AT 1745 HRS [Mr. POLLARD] WAS AT MILE POST 356 [Interstate] 80 WBL, HE WAS FOLLOWING A UT/514FVU [MAROON] 85 FORD THUNDERBIRD. THE REGISTERED OWNER HAS HAD A PRIOR CONCEALED WEAPONS CHARGE AND ALSO A COCAINE CHARGE, THIS [VEHICLE] IS OCCUPIED BY 2 HISPANIC MALES, REGISTERED OWNER IS RAUL BATALLA. THE INFORMATION IS FROM SALT LAKE CITY POLICE DEPARTMENT. PER [Mr. Pollard] THIS WOULD BE A GOOD CANDIDATE FOR TRAFFICKING DRUGS. [THIS IS FOR YOUR INFORMATION] IF A PATROL UNIT WOULD LIKE TO [POSSIBLY] CHECK IT OUT.

Later that same evening, Patrolman Phillip Archibald was working on I-80 outside of Rock Springs. He was parking in the median facing the westbound lane. He saw the Thunderbird at approximately 9:30 p.m. and thought it looked as if it was exceeding the speed limit. He pulled into the Interstate, followed the car, and saw it had Utah license plates. He then dropped back to allow the radar to work, clocked the Thunderbird at 68 miles per hour,[2] then sped up to check the license plate number. When he sped up to follow close enough to read the license, he saw the vehicle weaving within the lane and crossing the center line once as it went around a bend. He called in to verify the license number in the Pollard message to be sure he had the right vehicle.

When he received confirmation he was following the same vehicle referred to in the message, Patrolman Archibald turned on his overhead lights. The Thunderbird immediately pulled over. Patrolman Archibald walked up to the car and asked to see the vehicle registration card. Defendant Constantino Mota was driving. His cousin defendant Raul Batalla, the owner of the car, was the passenger. Neither defendant appeared to be impaired in any way. There was nothing unusual or suspicious about the vehicle. Patrolman Archibald asked to see the vehicle registration, driver's license and proof of insurance. Defendants produced the driver's license and registration but Mr. Batilla explained he could not find the insurance information. Patrolman Archibald took the paperwork back to the patrol car. While doing the paperwork he radioed his shift partner and asked her to provide backup because he was going to get a consent to search for drugs.

At the time he decided to search for drugs, Patrolman Archibald had no reason, other than the report from Mr. Pollard, to suspect

---

**2.** It was a 65 miles per hour zone.

that the Thunderbird contained drugs or that its occupants possessed drugs.

Patrolman Archibald went back to the Thunderbird, delivered a citation to Mr. Batilla for failing to maintain liability insurance and a warning citation to Mr. Mota for lane use and speeding. He explained to Mr. Batalla how, if there was insurance, he could get the ticket dismissed. While he was explaining, his shift partner drove up, parked her patrol car near his, got out of her car, and stood behind the passenger side of the Thunderbird to provide backup. Mr. Mota noticed the presence of a second patrolman.

Patrolman Archibald returned the registration and driver's license to the defendants. He then immediately went on to ask defendants if they had any drugs, guns or large amounts of cash. They said they did not. He asked if he could search the car, specifically the trunk. Defendants said he could. He asked them to push the button to open the trunk and Mr. Batalla did so. He then asked them to get out of the car and stand in the barrow pit while he searched. They did so under the watchful eye of the second patrolman. Throughout the encounter, the defendants were quiet, cooperative and did not act nervous.

A short search of the truck revealed two zip-lock baggies filled with a powdery substance in a laundry-type bag. Patrolman Archibald then placed defendants under arrest. The substance was later determined to be cocaine.

At the time Patrolman Archibald returned the papers, he was leaning on the Thunderbird with his leg pressed against the door—a posture he took for his own safety. He maintained this position while he asked defendants about drugs and asked to search the car. It took only about 30 seconds from the time he returned their papers for him to obtain their consent to search the car. Although their papers had been returned to them, it would have been impossible for the defendants to drive away without dislodging the patrolman and thereby endangering his personal safety.

Defendant Mota testified that both patrolmen were polite and nice throughout the encounter.

## CONCLUSIONS OF LAW

■ Defendants have been indicted for possession with intent to distribute cocaine and aiding and abetting in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) and 18 U.S.C. § 2. Defendants have filed motions to suppress the evidence of the cocaine on the ground that it was obtained in violation of their Fourth Amendment rights.

The circumstances under which law enforcement officers may seize and search individuals and their vehicles during traffic stops is frequently the subject of judicial opinion in this circuit.[3] In *United States v. Sandoval*, 29 F.3d 537 (1994) the Tenth Circuit succinctly sums up the pertinent law in area of traffic stops.

> *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880–81, 20 L.Ed.2d 889 (1968) and its numerous progeny teach that law enforcement officers may seize and search individuals based on a reasonable suspicion of criminal activity derived from 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion' (*id.* at 21, 88 S.Ct. at 1880)—something less than probable cause. [*Florida v.*] *Royer*, 460 U.S. [491,] at 500, 103 S.Ct. [1319,] at 1325, 75 L.Ed.2d 229 [1983] counsels that the permissible scope of any such 'investigative detention' depends on 'the particular facts and circumstances of each case,' but that in every case it 'must be temporary and last no longer than is necessary to effectuate the purposes of the stop.'

\* \* \* \* \* \*

An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid driver's license and proof

---

**3.** It is also the frequent subject of opinions from the Wyoming Supreme Court. See dissent in *State v. Welch*, 873 P.2d 601, 609 (1994) collecting cases on conflicting "drug profile" characteristics.

that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

*United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.1994) teaches that further questioning and the concomitant detention of a driver are permissible in either of two circumstances: (1) during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity [citations omitted] or (2) the driver voluntarily consents to the officer's additional questioning. In the first situation a Fourth Amendment seizure has taken place, but if is reasonable and consequently constitutional. In the second there is no seizure, and the Fourth Amendment's structures are not implicated. But if neither of those factors is present, evidence derived from further questioning (or, a fortiori, from an ensuing search) is impermissible.

*Id.* at 539–40 (internal quotations and citations partially omitted)

In this case, once the officer was satisfied that defendants were in lawful possession of the car and had issued the citations, he had effectuated the scope of the stop, and defendants should have been allowed to go on their way. Patrolman Archibald had no objectively reasonable and articulable suspicion that either the driver or passenger was engaged in illegal activity. He testified he pulled them over initially because the vehicle's weaving made him concerned about an "impaired driver." However, once he made contact with the driver his concern was laid to rest—the driver appeared to be neither impaired nor sleepy.

■ The United States contends that the information relayed through Mr. Pollard provides reasonable grounds for suspicion that would justify continuing the stop past the return of defendants' papers. The Tenth Circuit has rejected just such an argument in *Sandoval.* In *Sandoval,* the defendant was stopped for a speeding violation. The officer ran an NCIC computer check and found out the defendant had previously been involved in a "hit and run" and he had been arrested

but not convicted for a claimed narcotics violation in 1988. The Tenth Circuit held that such knowledge of a prior arrest or criminal involvement was, by itself, insufficient to establish the requisite reasonable suspicion that would justify continuing the encounter.

> ... even knowledge of a person's prior criminal involvement (to say nothing of a mere arrest) is alone insufficient to give rise to the requisite reasonable suspicion.

> \*    \*    \*    \*    \*    \*

> If the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrest but no convictions—could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all.

29 F.3d at 542–3.

In this case, as in *Sandoval,* the "prior offenses" consisted of a charge, not a conviction involving narcotics. Similarly, as in *Sandoval* this case involved a charge, weapons violations, that was six years old. By itself, this information was not a sufficient basis to give rise to a reasonable suspicion that defendant had committed or was committing a crime and thereby support continuation of the stop.

■ The government also contends that defendants voluntarily consented to the search. The government bears the burden on establishing consent, and voluntariness is a question of fact to be determined based on the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227–32, 93 S.Ct. 2041, 2048–49, 36 L.Ed.2d 854 (1973).

The government contends that upon the return of defendants' papers they were free to go once Patrolman Archibald returned their documents and issued them the proper paperwork. In examining whether the encounter was consensual after the return of the papers, we look to the objective impact of the officer's actions on a reasonable listener. *Sandoval,* 29 F.3d at 537. Thus, the fact that Patrolman Archibald told his shift partner that he intended to ask for consent to a

search is not dispositive because it involves his subjective intent.

Looking at Patrolman Archibald's actions from an objective viewpoint shows that there were simply no words nor gestures of closure from which a reasonable listener could have determined that the reason for detention was over and a consensual encounter was beginning. The patrolman did not pause in the conversation, he did not say anything to indicate his task was finished, and he did not move his body away from its leaning position on the Thunderbird. Any reasonable listener, in fact any decent person, would not have felt free to go about his or her business if that meant driving away and injuring the person leaning up against their car. Coupled with the lack of any language in the conversation to suggest the possibility of noncompliance on the defendants' part—as when an officer inquires, "May I ask you a few more questions" [4]—the continued positioning so that defendants could not leave without risking injury to the officer created a climate where the reasonable listener would not feel free to go about his or her business.

Thus, despite the return of the papers,[5] there was no voluntary consent to the officer's additional questioning.

Because there was no consensual encounter, defendants remained seized when they gave their consent to the search. When the question turned to drugs, and a request to search, areas outside of the reason for the traffic stop, as discussed above, the officer's actions were not based upon a reasonable suspicion. Therefore, the evidence of the cocaine must be suppressed because it is derived from further questioning and an ensuing search which is impermissibly tainted in Fourth Amendment terms.

There is nothing in the facts before this court which would establish the consent to search was sufficiently an act of free will to purge the primary taint of the illegal seizure. See *United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir.1989). To determine if the consent was sufficiently an act of free will

that would break the causal connection, the court looks to three factors:

> The temporal proximity of the [seizure and consent], the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct are all relevant. We have also regularly considered, as 'important factors' on the issue of voluntariness although not dispositive, whether the driver was informed of his right to refuse consent or to proceed on his way.

*Sandoval,* 29 F.3d at 543–4 quoting and adapting *United States v. Guzman,* 864 F.2d 1512, 1520 (10th Cir.1988); *Brown v. Illinois,* 422 U.S. 590, 603–4, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975).

In this case the consent was given within less than one minute of the patrolman's continuing the detention illegally, there were no intervening circumstances, the patrolman's purpose for the continued detention was to obtain the consent and defendants were not informed of their right to refuse the search or to proceed on their way. Thus, there are no facts which would support the government's position that the consent was voluntary in fact despite the taint of the unreasonable seizure.

Accordingly, the court must grant defendants' motion to suppress evidence of the cocaine found during the illegal search.

---

**4.** See *Sandoval* 29 F.3d at 541–2. "No, wait a minute" in response to defendant's query of "is that it" does not contemplate any possibility of noncompliance by the defendants.

**5.** Return of a driver's documentation is a necessary, but not by itself always as sufficient indication that the seizure is terminated. *Sandoval,* 29 F.3d at 539.