OPINION
{¶ 1} Plaintiff-appellant the State of Ohio appeals from an order suppressing evidence. The State contends that the trial court erred when it concluded that the evidence, crack cocaine in a plastic baggie, was obtained as the result of an unlawful search and seizure. We agree. Accordingly, the order of the trial court suppressing evidence is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
 I {¶ 2} Dayton Police Officer Paul Harris was in his cruiser, near his home, a little after 3:00 one late November morning, when he saw a car being driven by defendant-appellee Diahntae Bell cross the center line multiple times. Harris testified as follows:
 {¶ 3} "A. After I seen him do his traffic violations, I followed him. I pulled in a — watched him pull into the cul-de-sac.
 {¶ 4} "Q. What cul-de-sac did he pull into?
 {¶ 5} "A. I believe it was Brookmill Court. It's directly in front of his residence.
 {¶ 6} "Q. And where is his residence?
 {¶ 7} "A. It's 5357, I believe, Abby Loop. I believe that's the address.
 {¶ 8} "Q. What happened at that time? What did you do next?
 {¶ 9} "A. Watched him exit the vehicle. He went to the front door, knocked on the door, nobody answered. He was on a cell phone.
 {¶ 10} "Q. At the front door?
 {¶ 11} "A. Yes. He started looking up towards the upstairs window while talking on his cell phone, like he was calling the house for somebody to let him in. I don't know what he was saying. After a few minutes, after about five minutes passed, he walked around to the back of the house.
 {¶ 12} * * *
 {¶ 13} "Q. All right. What happened then, please?
 {¶ 14} "A. At that time I received a phone call from my wife saying she observed Mr. Bell walking between our yard back and forth —
 {¶ 15} "THE COURT: I'm sorry, you received a phone call from whom?
 {¶ 16} "THE WITNESS: My wife.
 {¶ 17} "THE COURT: Do you live near there?
 {¶ 18} "THE WITNESS: Yes; we are neighbors.
 {¶ 19} * * *
 {¶ 20} "THE COURT: All right. And did you know Mr. Harris before?
 {¶ 21} "THE WITNESS: I'm Mr. Harris, sir.
 {¶ 22} "THE COURT: I'm sorry. Did you know Mr. Bell before?
 {¶ 23} "THE WITNESS: I never knew him personally, no.
 {¶ 24} "THE COURT: But you've seen him, and you recognized him as your neighbor?
 {¶ 25} "THE WITNESS: I know his history, yes.
 {¶ 26} "THE COURT: Did you recognize him as your neighbor?
 {¶ 27} "THE WITNESS: Oh, yes.
 {¶ 28} "THE COURT: All right.
 {¶ 29} "BY MR. CONNELL [representing the State]: So you got a call from your wife?
 {¶ 30} "A. Yes.
 {¶ 31} "Q. On your cell phone, right?
 {¶ 32} "A. Yes.
 {¶ 33} "Q. What did she tell you?
 {¶ 34} "A. Saying the neighbor is walking back and forth between yards, yelling towards the house, his house.
 {¶ 35} "Q. His yard and whose yard?
 {¶ 36} "A. His yard and my yard, yelling towards his house, making a disturbance, woke up our child. Our child is now eight months, so I think he was five months old then. The dog is going crazy because he's making a disturbance, and at that time a few minutes passed in the back, he starts coming back towards the front.
 {¶ 37} "At that time I —
 {¶ 38} "Q. The front of his house or your house?
 {¶ 39} "A. He walks between my house and his house, walks between, and at that time I'm walking towards our house and made contact with him in the front yard of his house.
 {¶ 40} * * *
 {¶ 41} "Q. Let me ask you a couple more questions. You said you had known about him or know of him from any prior experiences?
 {¶ 42} "A. Yes.
 {¶ 43} "Q. What is that, please?
 {¶ 44} "A. The week before we got a call at his residence —
 {¶ 45} "Q. Meaning the police department.
 {¶ 46} "A. Yes. We received an emergency call from his girlfriend Dionne (phonet) Moore saying he's trying to break into the house.
 {¶ 47} "Q. There at 5537 Abby Loop.
 {¶ 48} "A. Yes.
 {¶ 49} "Q. Okay.
 {¶ 50} "A. At the time I wasn't sure if he lived there or if he was just a boyfriend there. He stays there occasionally. And when we arrived there on the scene, Officer Curley was the first one on the scene, began chasing him, and he hid in a wooded area behind our house. At that time the rest of the crews arrived on the scene. We recovered a firearm —
 {¶ 51} "THE COURT: Were you one of the crews?
 {¶ 52} "THE WITNESS: Yes, sir.
 {¶ 53} "THE COURT: Okay.
 {¶ 54} "THE WITNESS: We recovered a firearm there that was — was not frosted over like the rest of the yard, grass was. It was recovered in my back yard. It was not my gun. And Dionne Moore made a statement to Officer Nathan Curley —
 {¶ 55} "MR. GORALESKI: I would object to this, Judge.
 {¶ 56} "THE COURT: Who made the statement?
 {¶ 57} "THE WITNESS: Dionne Moore, the complainant of the agg. burglary.
 {¶ 58} "THE COURT: Dionne is the woman?
 {¶ 59} "THE WITNESS: Yes.
 {¶ 60} "THE COURT: I'll overrule the objection now because I think I see where this is going, but go on — made a statement to you or you saw this?
 {¶ 61} "THE WITNESS: Made a statement to another officer.
 {¶ 62} "THE COURT: Okay, go on.
 {¶ 63} "THE WITNESS: Saying that he has a gun, and Officer Nathan Curley found a firearm in the area where he was running from.
 {¶ 64} "Q. Which was in your back yard?
 {¶ 65} "A. Yes. And that night the yard was frosted over and the firearm was not frosted at all. It was completely dry.
 {¶ 66} "Q. All right. And this was how much — how much time prior to the incident where you were involved with him on —
 {¶ 67} "A. The agg. burglary complaint came in approximately eight days before. It was on the 14th, I think.
 {¶ 68} "Q. All right. Any other history that you knew about the defendant?
 {¶ 69} "A. Yes. From previous calls from other officers that went to that residence during the day, they asked me about my neighbors. I didn't know anything about them at that time. When I found out, I ran his information. He's been arrested for aggravated robbery where he robbed a Bank One at Keowee and Leo. He used a firearm then. I know he has some other arrest history, I think some traffic in there.
 {¶ 70} "Q. All right. So this was in your mind the night on 11-22 when you confronted him. Is that right?
 {¶ 71} "A. Yes.
 {¶ 72} "Q. I think you left off when he was walking between the two houses.
 {¶ 73} "A. Yeah. When he came out to the front yard, I walked up to him, I approached him, asked him what he was doing, if he had any firearms on him. He told me no, and I, at that time, I told him I was going to do a pat-down to make sure he didn't have any firearms on him at that time.
 {¶ 74} "Checked around his waist, checked his back, and at that time I went down his right leg — kept my palm straight and went straight down his leg, and when I was down by his ankle with a straight hand, I noticed a little baggie fell out of his pant leg."
 {¶ 75} Harris later testified that he thought Bell's Aggravated Robbery was in 1998 or 1999. At another point in his testimony, Harris testified:
 {¶ 76} "A. While I was in the back yard, my wife told me that he's climbing up on the stairs from the back sliding door, he's climbing up on the handrail. And from the agg. burglary complaint, he did the same thing where he went on the top of the roof and started playing with the window, trying to gain entry that way. So I was thinking about the safety of Dionne Moore, thinking he might try to break in the house again.
 {¶ 77} "But he did not do that. He just put his foot on the handrail, then got down and then he was just walking back and forth causing a disturbance. I was also worried about my child and my wife. I wasn't sure if he would do anything to cause a disturbance with them or anything, because she was looking out the window at that time."
 {¶ 78} Bell was arrested and charged with Possession of Crack Cocaine. He was also cited for the traffic violation. Bell moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure. Following a hearing, the trial court agreed with Bell, and ordered the evidence suppressed. From that order, the State appeals.
 II {¶ 79} The State's sole assignment of error is as follows:
 {¶ 80} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED BELL'S MOTION TO SUPPRESS."
 {¶ 81} The trial court found that the stop was proper, but concluded that the pat-down frisk was not. A pat-down frisk, being less intrusive than a full-blown search, requires less in the nature of probable cause. To justify a pat-down search, the officer must possess a reasonable belief that a lawfully stopped suspect is armed. Terry v. Ohio (1968), 392 U.S. 1, 27,20 L.Ed.2d 889, 88 S.Ct. 1868. "A search for weapons, whether of the immediate person of the suspect, or of areas to which the suspect has access or will gain access, must be justified by a reasonable and articulable suspicion that the suspect is dangerous and will gain immediate control of weapons." State v. Daniel (April 27, 1994), Montgomery App. 13891, at 7, citing Michigan v. Long
(1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201, fn. 14.
 {¶ 82} The trial court cites a number of federal cases for the proposition that a criminal record is an insufficient basis for a Terry pat-down frisk for weapons: United States v.Johnson (7th Cir., 2005), 427 F.3d 1053; United States v.Sandoval (10th Cir., 1994), 29 F.3d 537; and United Statesv. Cupps (6th Cir., 1974), 503 F.2d 277. But as those opinions point out, their holdings are limited to the proposition that a criminal record, by itself, does not subject a person to a stop-and-frisk at the whim of an officer. Thus, in Sandoval,
supra, the court held that: "If the law were otherwise, any person with any sort of criminal record * * * could be subject to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification." Id., at 542.
 {¶ 83} In the case before us, Bell's prior criminal history was not the basis for the stop; Officer Harris stopped Bell to cite him for a traffic violation. In our view, the combination of Bell's: having been arrested, at least, for an Aggravated Robbery of a bank, involving a firearm, in 1998 or 1999; having reportedly had a gun, which was recovered in Officer Harris's back yard, just eight days before; and Bell's peculiar behavior behind Dionne Moore's house, justified a reasonable police officer in believing that Bell was likely to be armed. Because Harris had a proper, independent basis for stopping Bell, he was justified in patting Bell down for his own safety, incident to the stop.
 {¶ 84} The State's sole assignment of error is sustained.
 III {¶ 85} The State's sole assignment of error having been sustained, the order of the trial court suppressing evidence is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
Brogan and Donovan, JJ., concur.