[Cite as *State v. Samuels*, 2011-Ohio-2567.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                        :          C.A. CASE NO.   24087

v.                                               :          T.C. NO.   07CR5122

MICHAEL D. SAMUELS                               :       (Criminal appeal from
                                             Common Pleas Court)

    Defendant-Appellant                       :

                                             :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   27th   day of   May  , 2011.

. . . . . . . . . .

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

TINA M. McFALL, Atty. Reg. No. 0082586, Assistant Public Defender, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
      Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the Notice of Appeal of Michael D. Samuels, filed June 8, 2010.  On January 29, 2008, Samuels was indicted on one count of possession of crack cocaine (less than one gram), in violation of R.C. 2925.11(A), a felony of the fifth degree.  On February 23, 2010, Samuels pled not guilty, and on March 9, 2010, he filed a motion to suppress,

which the trial court overruled after a hearing. Samuels withdrew his not guilty plea and entered a plea of no contest. The trial court found Samuels guilty and sentenced him to community control sanctions for a period not to exceed five years.

{¶ 2} Gregory Orick, a City of Dayton police officer, testified for the State at the suppression hearing. At the time of the hearing, Orick had been with the Dayton Police Department for over 10 years, and he previously worked as a military policeman in the Marine Corps for approximately 16 years. On December 9, 2007, Orick was conducting surveillance on an apartment building in the area of West Hudson and Wheatley Avenues, having received citizen complaints of drug activity at the location. According to Orick, he "had also conducted my own investigation there and deemed that it was continuing on like almost in a sale-type operation at that building.

{¶ 3} "That particular night I was there conducting more investigation for people going in and out of the apartment building for narcotic activity." Orick stated that he had arrested 10 to 12 people in the same apartment for drug activity within two to three weeks of the incident at issue, and in addition to drug activity, "there's a lot of prostitution" in the area. Orick further stated that "there were a couple of shootings down on the lower end of Hudson at Main Street.

{¶ 4} "It's an extreme high-crime transient-type area." Orick testified that at approximately 2:15 a.m., "I was directly across the street of the apartment building. I saw a dark vehicle pull up. The driver got out, went up to the main apartment door. It's a common area door. There's glass situated on each side of the door so you can see back through the hallway. There was a knock made on the door. At that point, a female came out of the bottom left apartment; let Mr. Samuels in. He went into the apartment. Approximately two and a half to three minutes later [he] re-emerged, got back in his car and began driving southbound.

{¶ 5} "The reason I mentioned the two to three minutes is is [sic] that's indicative of a drug sale in conjunction with all the other things I mentioned.

{¶ 6} "* * *

{¶ 7} "* * * If they're in there for more than five or ten minutes, it's usually not indicative of a sale. But for people that are going in and out for a sale, two to three minutes is generally the norm of my experience in drug arrests." Orick continued, "Generally people that want to buy the drugs don't want to stay in there. Some drug dealers will allow you to smoke into an adjacent building or apartment. However, if you're just buying, you want to get in and get out and go use your drugs and that's usually indicative of that time frame."

{¶ 8} Orick testified that he had been advised that a Caucasian woman named Pam usually opens the apartment door, and that a "mid-level dope dealer" was selling drugs there. On the night at issue, an African American woman opened the door for Samuels.

{¶ 9} Based upon his observations, Orick decided to initiate a traffic stop of Samuels, and he radioed for assistance. Once Samuels had traveled "a distance" from the apartment building, Orick activated his overhead lights and stopped Samuels, who was the only occupant of the vehicle. Orick stated that prior to making contact with Samuels, he did not observe any suspicious movements or behaviors in the vehicle. As Orick approached the vehicle, he testified, "there's an eight-step greeting that we use that I teach * * * . Once I start using this greeting, it's basically a verbal judo. It's the same thing I use over and over. It's my standard operating procedure. * * * While I'm saying this, I'm looking him over for his demeanor.

{¶ 10} "At this point, I notice that his right hand is starting to go in between the center console and the seat and I tell him to keep his hands on the steering wheel. I had to repeat this

twice at which point then I go ahead and extract him from the vehicle," due to Orick's concerns for officer safety. Orick stated that when he initially observed Samuels' right hand moving toward the console, Samuels' left hand was "on his thigh below the steering wheel and it was clenched." As Samuels exited his vehicle, Officer Speelman arrived to assist Orick. Orick instructed Samuels to open his left hand, and therefrom Orick retrieved what appeared to be crack cocaine in a baggie. Orick conducted a pat down, handcuffed Samuels and walked him to Orick's cruiser. Orick testified that he asked Samuels to open his left hand because he was concerned that Samuels might be carrying a small knife.

{¶ 11} Once Samuels was inside the rear of the cruiser, Orick, who was in the driver's seat, read Samuels his rights from a *Miranda* card. Samuels appeared alert, and he indicated his understanding of each right. He did not appear to be intoxicated or under the influence of drugs. Orick stated that during his interaction with Samuels, Orick did not use physical force or threaten Samuels. Orick asked Samuels what was in the baggie that had been in his clenched hand, and Samuels told him it was crack cocaine. Speelman field-tested the substance with cobalt reagent and determined that it was crack cocaine. Orick then asked Samuels if he had any other contraband, and Samuels told Orick that he did, in the front pocket of his sweat pants. Orick removed Samuels from the cruiser and retrieved "a few more pieces" of crack from a white paper wrapper in Samuels' pocket. Orick field-tested the pieces and determined that they were crack cocaine. Orick transported Samuels to jail. Orick subsequently learned that Samuels had an unrelated warrant from Montgomery County for driving under suspension.

{¶ 12} On cross-examination, Orick stated that Samuels' vehicle was legally parked when Samuels approached the apartment, and that Orick did not observe any equipment

violations relating to the vehicle. Orick further stated that he did not observe any traffic violations when Samuels returned to his car and drove away. Orick stated that he decided to stop Samuels based upon the short duration of time Samuels spent within the apartment coupled with Orick's experience there and the information he had received regarding on-going drug activity. Orick stated that after he stopped Samuels' vehicle, but before Orick exited his cruiser, he performed a computer search of the tags on Samuels' vehicle, and there were no warrants associated with the vehicle.

{¶ 13} In overruling Samuels' motion to suppress, after summarizing Orick's testimony, the trial court concluded that "the basis for the initial stop, that Defendant went inside a residence where drugs had been sold and left a few minutes later, was insufficient to justify a stop of the Defendant. However, whether the initial justification of the stop was lawful or not under both State and Constitutional safeguards is irrelevant. This Second District Court of Appeals has held that, because of an outstanding warrant, a defendant has 'no reasonable expectation of privacy to be free from arrest and search by the police.' *State v. Williams*, Montgomery App. No.22535, 2008 Ohio 6030, ¶22, citing *State v. Smith,* Montgomery App. No. 22434, 2008 Ohio 5523, ¶ 11. The essential argument for upholding an otherwise unjustified stop of a person subject to an outstanding arrest warrant is that 'the authority for the stop, and the resulting intrusion upon the individual's liberty, is not predicated upon any facts or circumstances known to the stopping officer, but upon the independent authority of the arrest warrant, itself, thereby making the facts and circumstances known to the officer immaterial.' *State v. Harding*, Montgomery App. No. 22747, 2009 Ohio 59, ¶ 20.

{¶ 14} "The fact that officer Orick did not become aware of the outstanding warrant until

after the stop and search is likewise irrelevant. (Citation omitted). In short, the existence of the arrest warrant rendered Officer Orick's search and seizure of the drugs on Defendant's person lawful. See *Williams*, supra, at ¶ 22.

{¶ 15} "With respect to Defendant's statements made during the stop, defense argues that 'such statements were not made voluntarily and were made without the benefit of counsel, without full and adequate explanation of defendant's rights, and without a knowing and intelligent waiver of these rights.' * * * The Ohio Supreme court has held that 'a court may infer from the totality of the circumstances that a defendant voluntarily, knowingly, and intelligently waived his rights.' (Citations omitted). * * *

{¶ 16} "The Court finds that Officer Orick adequately advised Defendant of his *Miranda* rights and that Defendant understood those rights. Defendant did not ask for clarification, did not ask for counsel, and did not state that he did not understand the warnings. Defendant indicated by nodding his head and answering 'yes' when Officer Orick asked him if he understood each right. Officer Orick read the *Miranda* warnings directly from a card provided to him by the Montgomery County Prosecutor's Office. There is no evidence of any threats made by Officer Orick, nor any mental incompetence on the part of the Defendant that would affect the intelligence or voluntariness of Defendant's waiver. Therefore, the Court finds that any statements made by Defendant after Officer Orick advised him of his *Miranda* warnings are admissible."

{¶ 17} Samuels asserts one assigned error as follows:

{¶ 18} "THE TRIAL COURT ERRED WHEN IT FAILED TO APPLY THE CASE LAW AT THE TIME OF THE UNLAWFUL STOP, AND FOUND UNDER THE CURRENT

CASE LAW THE DEFENDANT/APPELLANT HAD NO REASONABLE EXPECTATION OF PRIVACY DUE TO AN OUTSTANDING WARRANT."

{¶ 19} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." *State v. Purser*, Greene App. No. 2006 CA 14, 2007-Ohio-190, ¶ 11.

{¶ 20} Samuels primarily relies upon *State v. Lynch* (June 6, 1998), Montgomery App. No. 17028. In *Lynch*, we affirmed the trial court's decision sustaining Lynch's motion to suppress. Lynch was stopped by officers in broad daylight, based merely upon "a generalized hunch," in an area known for prostitution and drug activity. Lynch was not suspected of having committed any crime. The officers conducted a pat down, retrieving a baggie of crack cocaine from Lynch's person. Lynch was cooperative and advised the officers that he was subject to outstanding capias warrants. We determined that both the stop and search were constitutionally improper. We rejected the State's argument that the exclusionary rule did not apply due to Lynch's outstanding capias: "If the Court were to adopt the reasoning advanced by the State, then any

individual with even a minor misdemeanor traffic capias has forfeited any and all Fourth Amendment safe guards."

{¶ 21} As the trial court herein noted, we have since determined that the existence of an outstanding arrest warrant is "independent authority" for an "otherwise unjustified stop of an individual * * * and the resulting intrusion upon the individual's liberty." *Harding*, ¶ 20; *Williams*, ¶22. We disagree with Samuels that *Lynch* is the "binding applicable authority at the time of the unlawful stop," such that the trial court's reliance upon *Harding* and *Williams* is an unlawful retroactive application of the law.

{¶ 22} "'In considering the issue of the retroactive application of new case law, the Supreme Court of Ohio has stated that any judicial alteration of a criminal rule of law must be applied to any case which is still pending in our state court system. However, once a conviction has become "final" because the defendant can no longer pursue any appellate remedy, any new case law cannot be applied retroactively even if it would be relevant to the facts of his case.'" *State v. Harrison*, Portage App. No. 2004-P-0068, 2005-Ohio-4212, ¶ 19, citing, in part, *State v. Evans* (1972), 32 Ohio St.2d 185, 187.

{¶ 23} Samuels was stopped on December 9, 2007, and *Harding* and *Williams* were subsequently decided, but Samuels' case had not concluded prior to the subsequent decisions, and the application of *Harding* and *Williams* to the matter herein is proper. In other words, Samuels lacked a reasonable expectation of privacy, and the existence of his warrants rendered Orick's search and seizure of the drugs lawful.

{¶ 24} Finally, we agree with the State that Samuels' reliance upon *State v. Jamison* (May 11, 2001), Montgomery App. No. 18453, is misplaced. See *State v.*

*Walker-Stokes*, 180 Ohio App.3d 36, 2008-Ohio-6552, ¶ 40 (holding that the exclusionary rule does not apply to a *Terry* stop violation involving the subject of an outstanding arrest warrant and expressly overruling *Jamison*).

{¶ 25} There being no merit to Samuels' sole assigned error, it is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and KLINE, J., concur.

(Hon. Roger L. Kline, Fourth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

R. Lynn Nothstine
Tina M. McFall
Hon. Barbara P. Gorman, Administrative Judge
(trial judge-Hon. Michael T. Hall)


Case Name:      *State of Ohio v. Michael D. Samuels*
Case No.:        Montgomery App. No. 24087
Panel:      Fain, Donovan, Kline
Author:         Mary E. Donovan
Summary: