No. 2--03--1107                            

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE

OF ILLINOIS,

Plaintiff-Appellant,

v.

MARSHALL L. MITCHELL,

Defendant-Appellee.

)

)

)

)

)

)

)

)

)

)

Appeal from the Circuit Court

of Winnebago County.

No. 02--CF--315

Honorable

John R. Truitt,

Judge, Presiding.

______________________________________________________________________________

JUSTICE GROMETER delivered the opinion of the court:

The State appeals from the trial court's decision granting defendant's motion to quash his arrest and suppress evidence.  The State argues that there is nothing constitutionally suspect in the police stopping people for no reason 
who are walking down the street, demanding identification, 
and running warrant checks on them.  For the reasons that follow, we affirm.

I.  BACKGROUND

Defendant, Marshall Mitchell, could not sleep.  So, shortly before 5 a.m., he 
went for a walk in his neighborhood.  Minutes after leaving his home, he encountered Officers Shawn Toepfer and David Lee of the Rockford police.

Officer Toepfer testified that at the time he and Officer Lee encountered Mitchell, they had been in the area responding to an anonymous tip and investigating an unoccupied car that had been left running
.  By the time they encountered Mitchell, Officer Toepfer testified, they had dealt with the running car.  
With regard to the anonymous tip, Officer Toepfer testified that, by the time he encountered Mitchell, he "wasn't really looking for anyone who committed a crime."
  Officer Toepfer also testified that 
he did not think Mitchell was in need of aid, that he did not think Mitchell was involved in anything criminal, and that he did not think there was anything suspicious about Mitchell.  In fact, Officer Toepfer testified that Mitchell was just walking.  Notwithstanding all of this, Officer Toepfer and Officer Lee approached Mitchell, and Officer Toepfer began questioning him.  He asked Mitchell what he was doing out so early in the morning.  Mitchell told him he was just walking, as he usually does when he has trouble sleeping.  Officer Toepfer asked Mitchell what his name was.  Mitchell told him.  Officer Toepfer asked Mitchell for identification.  Mitchell gave it to him.  Officer Toepfer saw that the name on the identification matched the name Mitchell had given him.  At that point, still having no reason to suspect Mitchell of anything, Officer Toepfer took Mitchell's identification and returned to his squad car.  With Mitchell's identification in his possession, Officer Toepfer ran a computer check on him.  Officer Toepfer testified that he did this to see if there were any warrants outstanding for Mitchell.

Officer Lee testified that this is standard practice.  That is, he testified that, whenever he meets someone on the street, he runs a warrant check on that individual.  He did not testify that this is his practice only when there is some reason to believe that the individual might have an outstanding warrant.  Nor did he testify that this is his practice only when there is some reason to believe that the individual might be involved in wrongdoing.  Rather, on direct examination, in response to a question by the State, Officer Lee testified that it is his practice, whenever he comes into contact with people, to run warrant checks on them.  

In this case, the check revealed a traffic warrant for Mitchell.
(footnote: 1)  The officers handcuffed Mitchell and put him in the back of Officer Toepfer's squad car.  Mitchell waited there for a police van to come and take him away.  Once the van finally arrived, it transported him to jail.  He was then searched, and a small amount of cocaine was discovered.  He was charged with possession of a controlled substance, and he moved to quash his arrest and suppress evidence.  In that motion, Mitchell argued that allowing police to stop people walking down the street for no reason 
and run warrant checks on them is inconsistent with the fourth amendment's guarantee of freedom from unreasonable search and seizure.  The trial court agreed and granted the motion.  The State filed a motion to reconsider, which the trial court denied.  That same day, the State filed this timely appeal.

II.  ANALYSIS

We begin by setting out the standard of review.  When reviewing a trial court's decision on a motion to quash an arrest and suppress evidence, 
we consider whether the trial court's determinations of fact and credibility are against the manifest weight of the evidence, and we review 
de novo
 the trial court's ultimate legal conclusion.  
People v. Sorenson
, 196 Ill. 2d 425, 430-31 (2001)
.  Here, the relevant facts are not in dispute, and the trial court made no credibility determinations relevant to this appeal.  Thus, our review is 
de novo
.

Next, we set forth the constitutional framework that governs our review.  The fourth amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons *** against unreasonable" seizures.  U.S. Const., amend. IV; see also 
Ill. Const. 1970, art. I, §6.  
In construing the demands of the fourth amendment, our supreme court has recognized that there are three levels of encounters between citizens and police
.  
People v. Gherna
, 203 Ill. 2d 165, 176 (2003).  The first level is an arrest, which must be supported by probable cause.  
Gherna
, 203 Ill. 2d at 176-77.  The second level is an investigatory stop, which must be supported by reasonable suspicion.  
Gherna
, 203 Ill. 2d at 177.  The third level is a consensual encounter, which does not implicate the fourth amendment.  
Gherna
, 203 Ill. 2d at 177.

The State makes three arguments in defense of the behavior of the police in this case.  First, although the State concedes that the police had no reason to engage Mitchell, it argues that when they did so they were acting pursuant to their "community caretaking" function.  Therefore, the State concludes that the conduct of the police does not offend the fourth amendment.  Second, the State argues that, even assuming that the police were not acting pursuant to their community caretaking function, their encounter with Mitchell was nevertheless consensual and therefore does not offend the fourth amendment.  Third, the State argues that, if the conduct of the police offends the fourth amendment, the discovery of the warrant purges the taint of that offense from the evidence obtained and therefore the fourth amendment does not require that the evidence be suppressed.  We take these points in turn.

First, the State argues that the police were performing a "community caretaking" function when they stopped Mitchell.  Initially, we note that the State raises this argument for the first time on appeal.  This argument is therefore waived, and we will not consider it.  See 
Haudrich v. Howmedica, Inc.
, 169 Ill. 2d 525, 536 (1996) (noting that "[i]t is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal").  We do, however, make the following observations about the State's argument.

The State confuses encounters justified by the community caretaker exception with consensual encounters.  This is not at all surprising, since the same confusion appears in numerous Illinois cases.  
See, 
e.g.
, 
People v. Harris
, 207 Ill. 2d 515, 522 (2003); 
People v. Murray
, 137 Ill. 2d 382, 387 (1990); 
People v. Laake
, 348 Ill. App. 3d 346, 349 (2004).  This confusion is unfortunate.  As it has developed in other jurisdictions, the community caretaker doctrine is a viable, logical exception to the requirements of probable cause and reasonable suspicion when the police invade an interest protected by the fourth amendment.  It has nothing to do with consensual encounters; for, by their very nature, consensual encounters need no justification.  Treating it as synonymous with consensual encounters deprives the doctrine of any analytical content.

In essence, the community caretaker doctrine allows the police to invade a fourth amendment interest to assist a citizen when the invasion is totally divorced from the crime-control function that the police also serve.  For example, suppose a driver leaves his hat on top of his vehicle.  A police officer observes the driver proceeding down the road, pulls behind him, activates the squad car's overhead lights, stops the vehicle, and warns the driver that he is about to lose his hat.  In such an instance, the officer clearly has effected a seizure.  Moreover, no probable cause or reasonable suspicion exists.  The seizure is nevertheless justified because it is reasonable under the circumstances.  See 
 
State v. Chisholm
, 39 Wash. App. 864, 696 P.2d 41 (1985).  It is reasonable because we, as a society, want the police to provide this sort of assistance.  Since it is reasonable, it does not offend the fourth amendment, which prohibits only
 unreasonable searches and seizures.  
People v. Hall
, 352 Ill. App. 3d 537, 545 (2004).  We do note, parenthetically, that courts that have employed this exception in this manner have shown a willingness to inquire into the subjective motivation of the police officer who attempted to act under the exception.  See 
State v. Anderson
, 142 Wis. 2d 162, 169, 417 N.W.2d 411, 414 (1987).

Second, the State argues that, even if the community caretaker exception does not apply, the encounter was nevertheless consensual.  Thus, the State reasons, no seizure occurred and the conduct of the police does not implicate the fourth amendment.  
An encounter between the police and a citizen becomes nonconsensual, and a "seizure" occurs, if a reasonable person in the defendant's position would not have felt free to disregard the police and go on about his  business.  
Florida v. Bostick
, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398, 111 S. Ct. 2382, 2386 (1991).  To determine whether an encounter constitutes a seizure, this court must look at the totality of the circumstances and determine whether the conduct of the police would have communicated to a reasonable person that he was not free to leave or otherwise terminate the encounter.  
Bostick
, 501 U.S. at 434, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386.

Here, police confronted Mitchell as he was walking through his neighborhood.  Officer Toepfer asked him what he was doing and for his identification.  Then, having received from Mitchell all that he had asked for (and still having no reason to suspect him of anything), Officer Toepfer took Mitchell's identification and returned to his squad car with it.  The State argues that none of this would have communicated to a reasonable person that he was not free to leave.  In support of this argument, the State correctly points out that an encounter between the police and a citizen does not become nonconsensual merely
 because the police ask a few questions or ask the citizen for identification.  
Bostick
, 
501 U.S. at 434, L. Ed. 2d at 398, 111 S. Ct. at 2386.

However, that is not what happened here.  To be sure, Officer Toepfer began by asking Mitchell a few questions and asking him for his identification.  Then he took Mitchell's identification, returned to his squad car with it, and ran a warrant check on Mitchell.  On these facts, we do not believe that a reasonable person would have felt free to leave.  A reasonable person simply would not leave his identification behind and go about his business.
  Indeed, as Mitchell succinctly put it:
 "I know I couldn't leave because [they] had my ID."
  Thus, the conduct of the police in taking Mitchell's identification and returning to their car with it to run a warrant check on Mitchell was a "seizure."

According to the State, however, we should consider that "nothing in the record indicates that defendant could not have requested the officer to return his identification and departed the scene."  The fact that he did not, says the State, is proof that the encounter was quick and unintrusive.  The State argues that we will "virtually obliterat[e]" the consensual encounter exception to the fourth amendment if we conclude that the encounter here was not consensual.

Although it is not entirely clear, the State appears to be suggesting that a reasonable person in Mitchell's position would have felt free to terminate the encounter by demanding the return of his identification.  Contrary to the State's suggestion, a reasonable person in Mitchell's position would not have felt free to approach the squad car, knock on the window, and demand the immediate return of his identification.  A reasonable person would have stood right where the police had left him and waited for them to return his identification.  In other words, a reasonable person in defendant's position would not have felt free to go about his business.  Defendant was seized.  As our supreme court has stated,
 "[a]lthough our legal system is steeped with rules, standards, and formulas, logic and common sense should be no less a part of it."  
People v. Gonzalez
, 204 Ill. 2d 220, 234 (2003). 

While no Illinois court has addressed the precise issue presented here, courts in other jurisdictions have found that similar police conduct amounted to a seizure.  For example, in 
Salt Lake City v. Ray
, 998 P.2d 274, 278 (Utah App. 2000), the Utah Court of Appeals held that a seizure occurred when, after approaching a woman who was standing in a parking lot, police took her identification and ran a warrant check on her.  The Utah Court of Appeals reasoned that "it is clear that a reasonable person in [the defendant's] position would not feel free to just walk away, thereby abandoning her identification, let alone to approach [police], take back her identification, and then leave."  
Ray
, 998 P.2d at 278.  Similarly, in 
State v. Daniel
, 12 S.W.3d 420, 428 (Tenn. 2000), the Tennessee Supreme Court held that a seizure occurred when police took the identification of a man standing near a car and ran a warrant check on him.  The Tennessee Supreme Court reasoned that the defendant was "immobilized" without his identification, and the court noted that it was both unrealistic and impractical to think a reasonable person in the defendant's position would simply leave his identification behind and walk away.  
Daniel
, 12 S.W.3d at 427.  Notably, the court also stated that "[c]ontrary to the State's assertion, when an officer retains a person's identification for the purpose of running a computer check for outstanding warrants, no reasonable person would believe that he or she could simply terminate the encounter  by asking the officer to return the identification."  
Daniel
, 12 S.W.3d at 427.  The State appears to make the same assertion in the instant case, and we similarly reject it.

Finally, we note that the State attempts to distinguish 
People v. Harris
, 207 Ill. 2d 515 (2003), and 
People v. Torres
, 347 Ill. App. 3d 252 (2004).  Mitchell also relies on these cases.  We find them inapposite.  In both 
Harris
 and 
Torres
 police ran warrant checks following valid investigatory stops, that is, stops based on reasonable suspicion.  The issue in those cases was whether police had impermissibly extended the scope of an initially valid stop.  Here, by contrast, police had no reason to approach Mitchell.  And the issue here is whether police may, having no reason to do so, approach individuals, take their identification, and run warrant checks on them.  Thus, 
Harris
 and 
Mitchell
 do not control the analysis of the present case.  Other cases cited by the parties that, like 
Harris
, involve traffic stops, fail to inform this analysis for similar reasons.
  
In short, police seized Mitchell when they took his identification and ran a warrant check on him, and because they had no reason for doing so, their conduct violates the fourth amendment.

Similarly, Illinois statutory law provides no support for the State's position.  For example, section 107--14 of the Code of Criminal Procedure of 1963 states that a police officer may stop a person in a public place, demand identification, and ask for an explanation of the person's actions.  
725 ILCS 5/107--14 (West 2002).
  However, an officer is allowed to do so only where "the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense."  
725 ILCS 5/107--14 (West 2002).
  
Whether the officer in the instant case had a basis to detain defendant in the first place is what is at issue here; thus, statutes such as these provide no guidance.  Section 107--14, in fact, merely codifies 
Terry v. Ohio
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).  
People v. Dionesotes
, 235 Ill. App. 3d 967, 968-69 (1992).

Third, and finally, the State argues that, assuming the police violated the fourth amendment,  the discovery of the warrant removed the taint of that violation.  
In this argument, the State relies on the familiar "fruit of the poisonous tree" doctrine.  See 
Wong Sun v. United States
, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).  Pursuant to that doctrine, we must determine whether, granting that police acted improperly, the evidence sought to be suppressed was obtained by exploitation of the impropriety or by some other means sufficiently distinguishable from the impropriety so as to dissipate its taint from the evidence and, in so doing, eliminate the need for suppression.  
Wong Sun
, 371 U.S. at 488, 9 L. Ed. 2d at 455, 83 S. Ct. at 417-18.

In support of this argument, the State relies on 
United States v. Green
, 111 F.3d 515 (7th Cir. 1997).  There, police improperly stopped a car driven by the defendant.  They  asked for identification from the defendant and his passenger and ran a computer check on both.  The computer check revealed an outstanding warrant for the defendant's passenger, whom police then arrested.  During a lawful search of the car incident to the passenger's arrest, the police found drugs and guns belonging to the defendant.  The trial court denied the defendant's motion to suppress, and the Seventh Circuit affirmed.  
Green
, 111 F.3d at 517.  In upholding the trial court's decision, the Seventh Circuit found that the evidence against the defendant was not the fruit of the poisonous tree because 
 the discove
ry of the arrest warrant purged that evidence of the taint of the initial improper vehicle stop.  
Green
, 111 F.3d at 523.

The Seventh Circuit came to this conclusion by applying the three-part test set forth in 
Brown v. Illinois
, 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62 (1975).  In that case, the Supreme Court articulated the following three factors for determining whether the causal chain between the illegal police conduct and the procurement of the evidence is sufficiently attenuated such that the evidence is admissible: (1) the amount of time that elapsed between the illegality and the acquisition of evidence; (2) any intervening circumstances; and (3) the purpose and the flagrancy of the police misconduct.  The ultimate question to be answered is whether the evidence was acquired as the result of the 
" 'exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "  
Wong Sun
, 371 U.S. at 488, 9 L. Ed. 2d at 455, 83 S. Ct. at 417,
 quoting J. Maguire, Evidence of Guilt 221 (1959).
  The rationale for these rules reflects the justification of the exclusionary rule itself--to deter unlawful police conduct.  
People v. Turnage
, 162 Ill. 2d 299, 307 (1994).  Where the acquisition of evidence is sufficiently removed from the unlawful police conduct, the deterrent value of excluding it is diminished.  See 
Brown
, 422 U.S. at 599-600, 45 L. Ed. 2d at 425, 95 S. Ct. at 2259-60.

In light of both the law regarding attenuation and the policy underlying it, 
Green
 does not control the outcome of this case.  Like the 
Green
 court, we conclude that the relatively short time between defendant's arrest and the search weighs in favor of suppression.  See 
Green
, 111 F.3d at 521.  We also agree with both the 
Green
 court and the State that defendant's arrest is an intervening circumstance that militates toward attenuation.  See 
Green
, 111 F.3d at 521-22.  However, the facts of this case and those of 
Green
 are very different regarding the third factor articulated in 
Brown
, which is the purpose and flagrancy of the police misconduct.  In 
Green
, the purpose for which the officers stopped the defendant was completely unrelated to the subsequent warrant check that led to the arrest of a passenger in the defendant's vehicle and a search incident to that arrest.  In this case, the officers stopped defendant for no apparent reason other than to run a warrant check on him.  Thus, the purpose of the stop in this case was directly related to the arrest of defendant, which then led directly to the search of defendant.  Moreover, this case also differs with 
Green
 regarding the flagrancy of the official misconduct.  In 
Green
, the court specifically observed that "[t]here is also no evidence of bad faith on the part of the police."  
Green
, 111 F.3d at 523.  Such is not the case here.  While the harm to citizens from such conduct may not be terribly high, the complete disregard of citizens' rights to be "secure in their person" is clear.  Thus, unlike in 
Green
, two of the three factors set forth by the Supreme Court weigh in favor of suppression.  Moreover, the answer to the question, whether the evidence was obtained by exploiting the original illegality, is undeniably yes.

We also note that suppressing evidence under the present circumstances furthers the goal of the exclusionary rule.  In fact, it appears to be the only way to deter the police from randomly stopping citizens for the purpose of running warrant checks.  If the purpose of the police detaining a citizen is something other than simply checking for warrants, then, obviously, the police are looking for evidence pertaining to some other crime.  In such cases, the possibility that the object of their endeavor will be suppressed if they engage in some unlawful practice is an effective deterrent.  Where, as here, the sole apparent purpose of the detention is to check for a warrant, there is nothing else to suppress beyond anything relating to an unknown crime that might turn up, if we were to accept the State's position, since discovery of a warrant would justify the seizure of any additional evidence.  If nothing were found, no arrest or seizure would occur, and there would be nothing to suppress. 
  If we were to adopt the rule that the State advocates, there would be no reason for the police not to stop whomever they please to check for a warrant.  To hold that the discovery of a warrant in this case removed the taint of the illegality would be akin to holding that the substance of a confession obtained by coercion removes the taint of the coercive practices used to obtain it.

III.  CONCLUSION

In conclusion, we find none of the bases for reversal advocated by the State persuasive.  The State's warning that if we adopt defendant's position the police will never be able to do a warrant check is pure hyperbole.  Actually, we have not adopted any new position advocated by defendant.  Instead, we merely reaffirm that if the police wish to stop an individual, demand identification, take the identification away from the individual, and run a warrant check, they must have either reasonable suspicion that criminal activity is afoot, probable cause for an arrest, or the consent of the individual.  The circuit court of Winnebago County correctly determined that none of these things was present in the instant case, and we therefore affirm its judgment.

Affirmed.

BYRNE and GILLERAN JOHNSON, JJ., concur.

FOOTNOTES
1:
1
 The warrant was from Boone County for failure to appear on a "no insurance" ticket.