**The STATE of Ohio, Appellant,**

v.

**HARDING, Appellee.**

[Cite as *State v. Harding,* 180 Ohio App.3d 497, 2009-Ohio-59.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22747.

Decided Jan. 9, 2009.

498

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Kelly D. Crammer, Assistant Prosecuting Attorney, for appellant.

Glen H. Dewar, for appellee.

———————

FAIN, Judge.

{¶ 1} Plaintiff-appellant, the state of Ohio, appeals from an order of the trial court suppressing evidence. The state contends that the trial court erred in finding that the police officer who stopped defendant-appellee, William R. Harding, lacked reasonable and articulable suspicion justifying the stop, and, in the

alternative, that an outstanding warrant for Harding's arrest, although unknown to the officer at the time of the stop, furnished an independent basis for the stop.

{¶ 2} Although we agree with the trial court that the stopping police officer lacked reasonable and articulable suspicion to justify stopping Harding, we agree with the state that the outstanding warrant for Harding's arrest furnished an independent basis for the stop, even though the existence of the warrant was unknown to the officer at the time of the stop. Consequently, we conclude that the trial court erred when it suppressed the evidence obtained as a result of the stop. The order suppressing evidence is reversed, and this cause is remanded for further proceedings consistent with this opinion.

## I

{¶ 3} One morning in October 2007, Dayton Police Officer Greigee Coleman was on bicycle patrol with his partner, Officer Jason Barnes. Officers Coleman and Barnes were members of the Dayton Metropolitan Housing Authority ("DMHA") task force assigned to patrol the area between Groveland Avenue and McCabe Avenue in Dayton, Ohio. Officer Coleman testified that he and Officer Barnes had been ordered to check the area for trespassers and report other crimes committed in the area. Officer Coleman maintained that the DMHA property that they were ordered to patrol was known as a high-crime area and that he had personally made several arrests for "trespassing, guns, and drug activity."

{¶ 4} As he and Officer Barnes were traveling down Groveland Avenue, Officer Coleman observed Harding walking between two buildings located on DMHA property. Officer Coleman testified that it was his experience in patrolling the DMHA property that trespassers would often walk between the buildings to avoid detection by the police. After Harding left the DMHA property and crossed the street, Officer Coleman pulled his bicycle up next to him. Officer Coleman identified himself to Harding as a police officer and stated that he was patrolling the area for trespassers on DMHA property. Harding stopped walking, and Officer Coleman asked him whether he lived at the DMHA property. Harding stated that he did live at the property, and Officer Coleman asked him whether he could produce identification to verify his residence. Harding, who was wearing only jeans and a t-shirt, began to reach for his back pocket, ostensibly to retrieve his identification. Officer Coleman ordered him to stop moving. Officer Coleman testified that he patted Harding down in order to check for weapons as well as an ID card. Officer Coleman patted Harding down from behind but did not find a weapon or any identification. Harding stated that his ID might be in his front pocket. Officer Coleman patted the front of

Harding's body down, but again found nothing. Officer Coleman testified that he ordered Harding to hold his hands out to his sides during the search.

{¶ 5} After the pat-down, Officer Barnes asked Harding again whether he lived at the DMHA property. Upon being questioned a second time, Harding stated that he did not live at the DMHA property, but lived instead at a residence on South Upland. At this point, Officer Coleman testified that he asked Harding for his social security number, which Harding supplied. Shortly after transmitting Harding's social security number to police dispatch, Officer Coleman was informed that Harding had three outstanding warrants for his arrest. Officers Coleman and Barnes then arrested Harding, placed him in handcuffs, and performed a search incident to arrest. During the search, Officer Barnes found a baggie of crack cocaine located in Harding's right front coin pocket. Officer Coleman tested the substance at the scene with cobalt reagent; the substance tested positive for cocaine.

{¶ 6} Harding was charged by indictment for possession of crack cocaine in an amount exceeding five grams but less than ten grams, in violation of R.C. 2925.11(A), a felony of the third degree.

{¶ 7} Harding filed a motion to suppress the evidence, contending that it was obtained as a result of an unlawful search and seizure. After the suppression hearing, the trial court sustained Harding's motion to suppress in a written decision in which it found that no evidence was presented by the state that Harding was uncooperative or that he was doing anything illegal prior to the stop. The court held that although the initial encounter between Harding and the police was consensual, Officer Coleman's pat-down was not based on any reasonable and articulable suspicion that Harding was armed. Thus, the police had unlawfully detained Harding from the point of the pat-down through the remainder of the detention and subsequent arrest. The trial court further held that the illegality of detention was not cured by the existence of outstanding warrants for Harding's arrest. The trial court suppressed the crack cocaine found during the search of Harding incident to his arrest.

{¶ 8} From the order suppressing evidence, the state appeals.

## II

{¶ 9} The state of Ohio's sole assignment of error is as follows:

{¶ 10} "The trial court erred in granting the defendant's motion to suppress evidence discovered during a search incident to defendant's arrest on outstanding warrants."

{¶ 11} The state contends that the trial court erred when it sustained Harding's motion to suppress. Initially, the state argues that the totality of the

circumstances surrounding Officer Coleman's pat-down search of Harding was justified by a reasonable and articulable suspicion of criminal activity. Thus, the state asserts that Harding was lawfully detained when he provided Officers Coleman and Barnes with his social security number, which, in turn, led to Harding's arrest for three outstanding warrants. Pursuant to a lawful search incident to arrest for the outstanding warrants, Officer Coleman discovered a baggie of crack cocaine in Harding's right front pocket.

{¶ 12} In the alternative, the state argues that even if Harding's initial detention was unlawful, the officers seized the crack pursuant to a lawful search incident to a valid arrest premised on his three outstanding warrants. In support of this argument, the state relies on our holding in *Dayton v. Click* (Oct. 5, 1994), Montgomery App. No. 14328, 1994 WL 543210, in which we stated that when a valid warrant for arrest exists, the exclusionary rule does not apply to exclude evidence of an illegal act discovered after an unlawful detention. In light of the existence of an outstanding warrant, a defendant has no reasonable expectation of privacy to be free from arrest and search by the police. *State v. Williams*, Montgomery App. No. 22535, 2008-Ohio-6030, 2008 WL 4958640, citing *State v. Smith*, Montgomery App. No. 22434, 2008-Ohio-5523, 2008 WL 4688767, at ¶ 11.

A.   Officer Coleman Lacked Reasonable and Articulable Suspicion.

{¶ 13} "Contact between police officers and the public can be characterized in different ways. The first manner of contact and the least restrictive is contact that is initiated by a police officer for purposes of inquiry only. '[M]erely approaching an individual on the street or in another public place[,]' asking questions for voluntary, uncoerced responses, does not violate the Fourth Amendment. *United States v. Flowers* (C.A.6, 1990), 909 F.2d 145, 147. The United States Supreme Court has repeatedly held that mere police questioning does not constitute a seizure for Fourth Amendment purposes. *Florida v. Bostick* (1991), 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389; *INS v. Delgado* (1984), 466 U.S. 210, 212, 104 S.Ct. 1758, 80 L.Ed.2d 247. '[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; * * *, provided they do not convey a message that compliance with their request is required.' *Bostick*, 501 U.S. at 434–35 [111 S.Ct. 2382, 115 L.Ed.2d 389] (citations omitted). A person approached in this fashion need not answer any questions, and may continue on his or her way unfettered by any real or implied restraint, and he may not be detained even momentarily for his refusal to listen or answer. Id." *State v. Aufrance*, Montgomery App. No. 21870, 2007-Ohio-2415, 2007 WL 1454173, ¶ 12. Thus, an individual's Fourth Amendment rights are not implicated during a consensual encounter initiated by the police. Id.

{¶ 14} Warrantless searches are presumptively unreasonable under the Fourth and Fourteenth amendments to the United States Constitution unless the search comes under one of the narrow exceptions to this rule. See *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Pursuant to *Terry,* police officers are allowed to perform limited protective searches for concealed weapons when the surrounding circumstances create a suspicion that an individual may be armed and dangerous. Id.

{¶ 15} In Ohio, the propriety of a *Terry* stop must be viewed in light of the totality of the surrounding circumstances. *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph one of the syllabus. The totality of the circumstances must "be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271, citing *State v. Freeman* (1980), 64 Ohio St.2d 291, 295, 18 O.O.3d 472, 414 N.E.2d 1044. In order to be legal, " '[a] search for weapons, whether of the immediate person of the suspect, or of areas to which the suspect has access or will gain access, must be justified by a reasonable and articulable suspicion that the suspect is dangerous and will gain immediate control of weapons.' " *State v. Bell,* Montgomery App. No. 21518, 2006-Ohio-4648, 2006 WL 2578865, at ¶ 81, quoting *State v. Daniel* (Apr. 27, 1994), Montgomery App. No. 13891, 1994 WL 151653, at *3, citing *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201.

{¶ 16} Initially, the encounter between Officer Coleman and Harding was arguably consensual. Harding was responsive and cooperative with Coleman's inquiries. In a *Terry* stop, a consensual encounter becomes a seizure when, in view of all the circumstances surrounding the incident, by means of physical threat or show of authority, a reasonable person would believe he was not free to leave. *State v. Taylor* (1995), 106 Ohio App.3d 741, 748, 667 N.E.2d 60, citing *United States v. Mendenhall* (1980), 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497. We agree with the trial court's finding that once Officer Coleman ordered Harding to put his hands out to his sides and began frisking him, any reasonable person would have believed he was not free to leave. Once the pat-down began, the consensual encounter became a seizure.

{¶ 17} Officer Coleman did not discover any weapons during the pat-down search of Harding. Officer Coleman testified that Harding was free to leave after the pat-down was concluded, but Officer Coleman did not inform Harding of that fact, nor do we conclude that Officer Coleman would have simply allowed him to walk away, or, more importantly, that Harding would have concluded that he was free at that point to leave. At that point, Officer Coleman had no reasonable, articulable suspicion that Harding was violating the law. But

Officer Barnes persisted in questioning Harding regarding his place of residence. It was only then that Harding disclosed that he did not, in fact, live at the DMHA property. Upon being requested to do so, Harding gave Officer Coleman his social security number, which resulted in the officers' discovering the three outstanding warrants. The officers then arrested Harding on the warrants and performed a search incident to the arrest in which they discovered crack in Harding's pocket.

### B. The Outstanding Arrest Warrants Constituted an Independent Justification for the Stop.

{¶ 18} The state relies upon *Dayton v. Click* (Oct. 5, 1994), Montgomery App. No. 14328, 1994 WL 543210, for the proposition that the outstanding warrants for Harding's arrest, even though unknown to Officer Coleman at the time of the stop, constituted an independent authority for the stop. The state notes that in *State v. Jamison* (May 11, 2001), Montgomery App. No. 18453, 2001 WL 501942, we departed from the rule of law espoused in *Click* and held that "where the identification of a suspect as a person subject to an outstanding arrest warrant is the result of an unlawful search and seizure, the discovery of evidence as the result of a search subsequent to, and incident to, that arrest, is the result of the original unlawful stop and seizure, and must, therefore, be excluded."

{¶ 19} Most recently, however, we reaffirmed our holding in *Click* in *State v. Smith*, Montgomery App. No. 22434, 2008-Ohio-5523, 2008 WL 4688767, wherein we found that the defendant had no reasonable expectation of privacy because he had an outstanding warrant for his arrest. It did not matter that the police became aware of the warrant following, and as a result of, an otherwise unlawful detention. In *Smith*, we specifically overruled our prior holding in *Jamison*.

{¶ 20} The issue of whether an otherwise unlawful stop is justified by the existence of an outstanding warrant for the arrest of the individual stopped is not free from difficulty. See *State v. Ford*, 149 Ohio App.3d 676, 2002-Ohio-5529, 778 N.E.2d 642, ¶ 25. This author has found it possible to make compelling arguments on either side of this issue. Perhaps the best argument, and the essential argument, in favor of upholding an otherwise unjustified stop of an individual who is subject to an outstanding arrest warrant is that the authority for the stop, and the resulting intrusion upon the individual's liberty, is not predicated upon any facts or circumstances known to the stopping officer, but upon the independent authority of the arrest warrant, itself, thereby making the facts and circumstances known to the officer immaterial.

{¶ 21} In any event, the latest holding of this court can be found in *State v. Smith*, 2008-Ohio-5523, 2008 WL 4688767. Especially on close questions of law, the doctrine of stare decisis requires that we follow the latest holding of our

court upon an issue of law. *Wogoman v. Wogoman* (1989), 44 Ohio App.3d 34, 541 N.E.2d 128.

{¶ 22} Upon the authority of *State v. Smith*, the state's sole assignment of error is sustained.

### III

{¶ 23} The state's sole assignment of error having been sustained, the order of the trial court from which this appeal is taken is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Judgment accordingly.

WOLFF, J., concurs.

DONOVAN, P.J., dissents.

DONOVAN, Presiding Judge, dissenting.

{¶ 24} I dissent. I believe the bright-line rule adopted by the majority unconstitutionally infringes upon Harding's Fourth Amendment rights and opens the door to widespread abuse. The majority's decision represents a complete abandonment of the application of the exclusionary rule in any illegal detention and seizure where a search based upon the later discovery of an outstanding warrant is conducted.

{¶ 25} In favor of espousing a bright-line rule, the majority ignores numerous other state and federal jurisdictions that employ the attenuation test rooted in the United States Supreme Court's decisions in *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, and *Brown v. Illinois* (1975), 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. I acknowledge that *Wong Sun* did not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the Supreme Court held that the more apt question in such a case is whether, "granting [proof] of the [initial] illegality, the evidence [at issue was derived] by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Green* (C.A.7, 1997), 111 F.3d 515. The existence of outstanding warrants should not, in every instance, act to deprive an individual of his right to be free from an illegal detention and seizure. Whether the taint has been sufficiently purged depends on the circumstances surrounding a police officer's reasons for illegally detaining and searching an individual.

{¶ 26} The Supreme Court set out four factors to guide this analysis in *Brown v. Illinois* (1975), 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. The four *Brown*

factors are as follows: (1) the temporal proximity of the illegal police conduct and the discovery or acquisition of the disputed evidence, (2) the presence or absence of intervening circumstances, (3) the purpose or flagrancy of the police conduct, and (4) an evaluation of these three preceding factors in light of the policies underlying the Fourth Amendment and the exclusionary rule. 422 U.S. 590, 603, 95 S.Ct. 2254, 2261–2262, 45 L.Ed.2d 416.

{¶ 27} Employing these four factors, a court of appeals in Illinois upheld the suppression of evidence seized pursuant to an illegal detention even though warrants were subsequently discovered. In *People v. Mitchell* (2005), 355 Ill.App.3d 1030, 291 Ill.Dec. 786, 824 N.E.2d 642, appeal denied (2005), 215 Ill.2d 611, 295 Ill.Dec. 525, 833 N.E.2d 7, the defendant, a pedestrian, *was stopped on the street without any suspicion of criminal wrongdoing.* Id., 355 Ill.App.3d 1030, 291 Ill.Dec. 786, 824 N.E.2d at 644. Upon asking for and receiving the defendant's identification, the police officer discovered an outstanding warrant, arrested him, and pursuant to search subsequent to the arrest, discovered cocaine on the defendant. Id., 355 Ill.App.3d 1030, 291 Ill.Dec. 786, 824 N.E.2d at 644–45. In its analysis, the court found that the third *Brown* factor, regarding the purpose and flagrancy of the officer's conduct, to be the most significant. Combined with the first factor, the attenuation test dictated that the contraband be suppressed, despite the discovery of an outstanding warrant. Id., 355 Ill.App.3d 1030, 291 Ill.Dec. 786, 824 N.E.2d at 649–650. The court concluded that the evidence was obtained by exploiting the original illegality of the stop and that suppression of the evidence would further the goal of the exclusionary rule, because "it appears to be the only way to deter the police from randomly stopping citizens for the purpose of running warrant checks." Id., 355 Ill.App.3d 1030, 291 Ill.Dec. 786, 824 N.E.2d at 650.

{¶ 28} In *McBath v. State* (2005), 108 P.3d 241, an Alaska appeals court employed the attenuation test and held that any taint flowing from a police officer's illegal detention of defendant was dissipated by the subsequent discovery of outstanding warrants that justified the arrest and search of defendant incident to the arrest. The court held that there was no egregious or flagrant police misconduct, since the officer had a valid reason for asking the defendant for identification, given the release of property seized from the vehicle to the defendant who was a passenger in the vehicle following the arrest of the driver. The court further stated, however, that when evidence was obtained while police officers were executing an outstanding arrest warrant, "the flagrance of the police misconduct may still require suppression of the evidence—as, for example, where the police conducted an unjustifiable 'dragnet' investigative stop of many people, hoping to find some for whom there were outstanding arrest warrants." Id. at 249.

{¶ 29} In the case at bar, Officer Coleman clearly stated that his reason for patrolling the DMHA property was to sweep the area for "trespassers." Officer Coleman testified that his initial reason for stopping Harding was because he observed Harding walking in the grass between two DMHA buildings. Officer Coleman testified that in his experience, trespassers often walked between buildings at the DMHA property in order to avoid detection from law-enforcement officials. First of all, an individual walking in a grassy area between apartment buildings at approximately 10 a.m., without more, does not create a reasonable, articulable suspicion that the individual is engaged in criminal behavior. If that were so, residents and delivery men, for that matter, might be routinely detained and searched. Officer Coleman testified that he did not personally recognize Harding as a known trespasser on DMHA property, nor was he aware that Harding had outstanding warrants for his arrest until after he unlawfully seized Harding, patted him down, and obtained his social security number. Harding was on a public street, not on DMHA property, when Officer Coleman approached him. Throughout the entire encounter, as well as the two pat-downs and ensuing continued illegal detention, Harding was cooperative with all of Officers Coleman and Barnes's requests. I agree with the trial judge; Officer Coleman had no reason to suspect that Harding was breaking the law in any way. In fact, the evidence suggests that Officers Coleman and Barnes were on a fishing expedition, feeling empowered to make random stops. And this was not just a stop. Harding was almost immediately directed to put his hands in the air and submit to at least two pat-downs prior to the discovery of any warrant.

{¶ 30} As in *Mitchell,* Officers Coleman and Barnes's flagrant and impermissible conduct in illegally detaining Harding dictates that the contraband be suppressed, despite the ultimate discovery of outstanding warrants. An analysis to determine whether evidence seized after an illegal detention should be suppressed must involve a balancing of the mutual concerns of discouraging police conduct that results in the illegal detention of a citizen, while recognizing the legitimate interest of the state in enforcing outstanding arrest warrants. I believe that the correct balancing of these competing interests in this instance should result in suppression of the contraband discovered on Harding. The bright-line rule of law espoused by the majority today, rather than discouraging illegal police conduct, encourages police to engage in otherwise impermissible random stops and physical seizures of citizens in hopes that they may discover an outstanding warrant. The law should not hold that the ends justify the means.

{¶ 31} Today's holding endorses a policy that allows the police to randomly stop individuals and demand that they "show their papers." Almost any series of indiscriminate seizures is likely to produce some instances of criminality that might otherwise have gone undetected or unprevented. But were hindsight alone

to furnish the governing criteria, a vital constitutional safeguard of our personal security would soon be lost, particularly for those living in or near impoverished, crime-ridden areas. When we condone random stops like this one for simply "walking in the grass," we take one more step toward a police state and the complete erosion of civil liberties for all of our citizens, thus permitting overzealous officers to act with arbitrary impunity. "[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks* (1987), 480 U.S. 321, 329, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347.

{¶ 32} To permit a roving patrol conducting random stops in public housing areas for "walking in the grass" would subject the residents of these and other areas to potentially unlimited interference with their freedom of movement and enjoyment of the outdoors in their own communities, solely at the discretion of law enforcement. The Fourth Amendment should not permit this type of conduct by law enforcement, unfettered and unrestricted by the courts.

{¶ 33} Without the unreasonable detention, the officer had no reason to arrest Harding. Without the arrest, there could be no search. Without the search, there was no evidence against Harding. The detention and search being unlawful, the evidence is inadmissible as fruit of the poisonous tree. *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. To apply our prior holding in *Click* to these facts "reduces the Fourth Amendment to a form of words." *Silverthorne Lumber Co. v. United States* (1920), 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319. "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." Id.

{¶ 34} In light of the foregoing, I would affirm the ruling of the trial court. The bright-line rule of law promulgated in *Click* and its progeny should be abandoned in favor of application of the attenuation test detailed in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416.