NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellant*,

*v.*

CLINT ALLEN BATEMAN, *Appellee*.

No. 1 CA-CR 16-0597
FILED 6-22-2017

Appeal from the Superior Court in Maricopa County
No. CR2014-137561-001
The Honorable Jose S. Padilla, Judge

**REVERSED; REMANDED**

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Lisa Marie Martin
*Counsel for Appellant*

Maricopa County Public Defender's Office, Phoenix
By Nicholaus Podsiadlik
*Counsel for Appellee*

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Patricia K. Norris and Judge Jennifer B. Campbell joined.

---

**J O H N S E N**, Judge:

**¶1**　　　　The State appeals from the superior court's order granting Clint Allen Bateman's motion to suppress evidence police found during a search of his backpack. Because the superior court found that Bateman volunteered he might have an outstanding warrant "at [the] point in time" he handed detectives his identification, we reverse the superior court's ruling and remand for further proceedings.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**　　　　Scottsdale Police Detectives Vahle and Navarrete, along with a handful of other officers, set up surveillance outside a Phoenix hotel one morning.[1] They intended to watch for Emily McLeod, who had two felony arrest warrants and was suspected of participating in "at least 14 residential burglaries or attempts in Scottsdale."

**¶3**　　　　About three hours after surveillance began, McLeod's grandfather arrived at the hotel in a van and parked it near the room where McLeod was staying. After her grandfather knocked on the door, McLeod, bags in hand, exited the room with Bateman, who was pushing a bicycle and carrying a backpack. While McLeod loaded her bags into the van, Bateman walked toward the south end of the hotel parking lot. McLeod and her grandfather drove away; police stopped their van a short distance away.

**¶4**　　　　Vahle and Navarrete remained behind to approach Bateman. Without activating his lights or siren, Vahle drove his unmarked vehicle toward where Bateman was standing, parked a couple of spots away and walked up to him. Meanwhile, Navarrete also walked in Bateman's

---

[1]　　　　When reviewing a ruling on a motion to suppress, we consider only the evidence presented at the suppression hearing and view that evidence in the light most favorable to upholding the superior court's ruling. *State v. May*, 210 Ariz. 452, 454, ¶ 4 (App. 2005).

direction. Each detective was wearing a vest with "Police" printed on the front and back.

¶5            When Navarrete was 10 to 15 feet from Bateman, he asked Bateman if he could talk to him. Bateman consented, but indicated he was waiting for a taxi. The detectives then asked Bateman if they could search his backpack, to which Bateman responded, "No." According to Bateman, the detectives then asked "if I could set [the backpack] in the gravel out of arm's reach so that they could talk to me because they – you know, that way they felt safe . . . not knowing what was in the bag because I wouldn't let them go through it." In response to their request, Bateman agreed to set down the backpack.

¶6            One of the detectives asked to see Bateman's identification. "[W]ithin a few seconds," Bateman pulled out his identification and offered it to the officers. "[A]t that point in time," according to the superior court's findings, Bateman also volunteered to the detectives that he "possibly" had an outstanding warrant. Navarrete then returned to his vehicle with Bateman's identification to check for outstanding warrants.

¶7            After the detectives asked for Bateman's identification and he volunteered he might have an outstanding warrant, one of the detectives told Bateman to sit on the curb. As he sat there, his taxi arrived. When Bateman asked if he could leave in the cab, one of the officers told him, "No, we'll take care of it." Soon after, Navarrete confirmed Bateman had an outstanding warrant, and officers proceeded to arrest him. In Bateman's backpack, detectives found a handgun, several syringes, a plastic bag containing methamphetamine and other miscellaneous drug paraphernalia.

¶8            Bateman was charged with one count of misconduct involving weapons, a Class 4 felony; one count of possession of a dangerous drug, a Class 4 felony; and one count of use or possession of drug paraphernalia, a Class 6 felony. Before trial, Bateman moved to suppress the gun, drugs and paraphernalia found in his backpack, arguing they were obtained during an unlawful stop and seizure. At the suppression hearing, the court heard testimony from Vahle, Navarrete and Bateman, then granted Bateman's motion.

¶9            At the conclusion of the hearing, the court noted that the stop "was consensual at first." The court, however, found that Bateman was illegally seized in violation of the Fourth Amendment when he handed over his identification to detectives. The court stated:

[T]his is where the issue resolves. It doesn't resolve on the testimony because we have conflicting testimony. . . . [B]y Mr. Bateman's account . . . he was asked for his ID, he handed the ID over, and at that point in time it seems that he starts a conversation about warrants.

\* \* \*

[I]f you've got an ID and you just handed it to a police officer, even if you didn't feel you were free to leave, you're not going to leave because it's like leaving your credit card at a place where you actually gave them the credit card for food. You don't leave without it, or you try not to leave without it. We do it every day, and we forget about it. So at that point in time, he's definitely not free to leave.

Because the court thereby found the detectives detained Bateman without reasonable suspicion, it granted the motion to suppress.

¶10      After the court granted the State's subsequent motion to dismiss without prejudice, the State timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes sections 12-120.21(A)(1) (2017), 13-4031 (2017) and -4032(6) (2017).[2]

**DISCUSSION**

¶11      On appeal, the State argues the encounter was consensual until the moment Bateman volunteered he might have an outstanding warrant, at which point detectives had reasonable suspicion to detain him to check for outstanding warrants. In response, Bateman argues the superior court correctly found the encounter became non-consensual at the moment he tendered his identification, and further, that he was seized when the detectives retained his identification to check for warrants. Bateman also argues the stop was rendered non-consensual by each of two other events before he made his comment about the warrant: First, the detectives' original request to speak with him, and second, their request that he remove his backpack and place it out of arm's reach.

¶12      "We will not interfere with a trial court's ruling on a motion to suppress absent a clear abuse of discretion." *State v. Guillory*, 199 Ariz.

---

[2]      Absent material revision after the date of an alleged offense, we cite a statute's current version.

462, 465, ¶ 9 (App. 2001). We defer to the superior court's factual determinations, including its evaluation of the credibility of the witnesses, but review its conclusions of law *de novo*. *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118 (1996).

**¶13** The Fourth Amendment forbids "unreasonable searches and seizures." U.S. Const. amend. IV. "Of course, not all encounters between law enforcement and citizens constitute seizures." *State v. Serna*, 235 Ariz. 270, 272, ¶ 8 (2014) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "Encounters that are entirely consensual do not implicate the Fourth Amendment." *Id.* Thus, police officers may approach an individual and ask questions without infringing the individual's constitutional rights. *Id.* As the United States Supreme Court has explained, "[s]o long as a reasonable person would feel free to 'disregard the police and go about his business' the encounter is consensual and no reasonable suspicion is required." *Bostick*, 501 U.S. at 434 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Accordingly, police officers are "free to ask questions of persons they encounter 'as long as the police do not convey a message that compliance with their requests is required.'" *Serna*, 235 Ariz. at 272, ¶ 8 (quoting *Bostick*, 501 U.S. at 435).

**¶14** The superior court found the encounter between Bateman and the detectives was consensual at the outset. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (absent signs of force, "otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person"). Contrary to Bateman's argument, the evidence fully supports that finding: Bateman testified that after the detectives approached on foot, Navarrete asked Bateman in a "courteous" manner if he would talk to him. There is no evidence that the detectives displayed their weapons or physically touched Bateman at that time. And it appears the detectives did not further question Bateman until he gave his consent.

**¶15** As the encounter progressed, detectives asked Bateman for his identification. Bateman argues, and the superior court found, that he was not free to leave from the moment he handed over his identification to the detectives. But longstanding precedent advises that police officers may ask for an individual's identification and pose a few follow-up questions without running afoul of the Fourth Amendment.

**¶16** In *Mendenhall*, two federal agents approached a woman as she disembarked from an airplane at the Detroit Metropolitan Airport. 446 U.S. at 547-48. Although the agents lacked reasonable suspicion to detain the

woman, they asked to see her identification and airline ticket. *Id.* She produced her ticket and identification and answered a few follow-up questions based on the information contained in those documents. *Id.* at 548. Later, the agents searched the woman and found heroin. *Id.* at 549. At trial, the woman argued she was unreasonably seized in violation of the Fourth Amendment, and moved to suppress the heroin. *Id.* The Supreme Court disagreed, holding, in part, that "[t]he respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions." *Id.* at 555; *see also Bostick*, 501 U.S. at 437 ("As we have explained, no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required."); *Florida v. Royer*, 460 U.S. 491, 501 (1983) ("Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves [during consensual encounter]."); *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990) ("A seizure is not established by a mere request for identification nor by the initial holding and review of such documentation." (citation omitted)); *People v. Mitchell*, 824 N.E.2d 642, 647 (Ill. App. 2005) ("State correctly points out that an encounter between the police and a citizen does not become nonconsensual merely because the police ask a few questions or ask the citizen for identification.").

¶17        Here, although detectives lacked reasonable suspicion at the moment they asked Bateman to see his identification, their request did not render the encounter non-consensual for purposes of the Fourth Amendment. Bateman does not argue that he was ordered or forced to produce identifying information. Indeed, Bateman testified only that the detectives "asked" him for his identification and maintained a "courteous" tone throughout the encounter. Thus, under *Mendenhall*, we cannot conclude detectives violated the Fourth Amendment's prohibition against unreasonable seizures when they asked to see Bateman's identification and engaged him in a follow-up discussion based on the information contained therein.

¶18        Moreover, as the superior court found, Bateman volunteered his comment about a warrant "at [the] point in time" that he handed his identification to the detectives. At that moment, having learned from Bateman that there might be an outstanding warrant for his arrest, detectives had reasonable suspicion to detain him by asking him to sit on

the curb.[3] That finding by the superior court means that we need not address Bateman's further argument that he was detained when Navarrete took the identification back to the patrol car to check for outstanding warrants. Under the superior court's finding of fact, Bateman's comment about the warrant as he tendered his identification to the detectives gave them reasonable suspicion to detain him.

¶19 Bateman also argues he was detained without his consent when officers asked him to set his backpack on the curb. As the superior court recognized, the evidence about exactly when detectives made that request was not entirely consistent. By Vahle's account, he did not ask Bateman to remove his backpack until after the other officer finished running Bateman's identification through a computer check. Bateman, by contrast, testified officers asked him to set down the backpack soon after the encounter began. It does not matter, however, because even accepting Bateman's account as true, the detectives' request that he set down his backpack for reasons of officer safety did not render the encounter an unreasonable detention for purposes of the Fourth Amendment.

¶20 As recounted above, Bateman testified that detectives asked him to set down his backpack for reasons of their own safety: "[T]hey asked me if I could set [my backpack] in the gravel out of arm's reach so that they could talk to me because they – you know, that way they felt safe . . . not knowing what was in the bag because I wouldn't let them go through it." After Bateman set down the backpack, detectives did not move it or search it, but resumed their conversation with him.

¶21 To be sure, our supreme court has held that, absent consent or a reasonable suspicion, a police officer may not seize a weapon from an individual during a consensual encounter, even if the officer reasonably believes the person is armed and dangerous. *Serna*, 235 Ariz. at 276, ¶ 28. Nevertheless, in that case the court recognized "the need for officers to protect themselves in the course of their duties," *id.* at ¶ 29, and noted that an officer may "ask for consent to remove a gun for the duration of the encounter" without implicating the Fourth Amendment, *id.* at ¶ 27.

---

[3] Thus, this case does not present the issue of how long police may detain an individual without running afoul of the Fourth Amendment while they check for the existence of warrants. *See State v. Kinney*, 225 Ariz. 550, 556, ¶ 18 (App. 2010) (absent other reasons, "police officers may only detain a person long enough to determine whether there is an outstanding warrant for the person's arrest").

**¶22** Accordingly, notwithstanding Bateman's contention that he was not free to leave after the detectives asked him to set down the backpack, that request, and his resulting voluntary placement of the backpack on the curb, did not abridge his Fourth Amendment rights. *See Serna*, 235 Ariz. at 276, ¶ 27; *see also State v. Caraveo*, 222 Ariz. 228, 232, ¶ 17 (App. 2009) ("Regardless of whether the initial encounter was consensual or based on a valid *Terry* stop, officers may conduct a search when the suspect consents to the search.").

**¶23** In sum, we conclude the superior court erred by finding the detectives violated Bateman's Fourth Amendment rights when he turned over his identification in response to their request. Nor did the detectives abridge Bateman's rights when they approached him in the first place or when they asked him to set his backpack out of arm's reach while their conversation continued. Further, as we have held, after Bateman volunteered that there might be an outstanding warrant for his arrest, detectives had reasonable suspicion to detain him by directing him to sit on the curb.

## CONCLUSION

**¶24** For the foregoing reasons, we reverse the superior court's order granting Bateman's motion to suppress and remand this case for further proceedings.

